## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Jakob Tiarnan Rumble, | Case No. 14-cv-2037 (SRN/FLN) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| Fairview Health Services d/b/a Fairview Southdale Hospital, and Emergency Physicians, P.A., | |
| Defendants. | |

Christy L. Hall, Jill R. Gaulding, and Lisa C. Stratton, Gender Justice, Minnesota Women's Building, 550 Rice Street, Suite 105, St. Paul, MN 55103; Katherine S. Barrett Wiik, Robins Kaplan LLP, 800 LaSalle Avenue, Suite 2800, Minneapolis, MN 55402-2015, for Plaintiff.

Jessica M. Marsh, Sara Gullickson McGrane, and Scott D. Blake, Felhaber Larson, 220 South 6th Street, Suite 2200, Minneapolis, MN 55402-4504, for Defendant Fairview Health Services d/b/a Fairview Southdale Hospital.

Chad W. Strathman, Emergency Physicians P.A., 5435 Feltl Road, Minnetonka, MN 55343, for Defendant Emergency Physicians, P.A.

SUSAN RICHARD NELSON, United States District Judge

## I.      INTRODUCTION

This matter is before the Court on (1) Defendant Emergency Physicians, P.A.'s Motion to Dismiss [Doc. No. 11]; and (2) Defendant Fairview Health Services' Motion to Dismiss [Doc. No. 18]. For the reasons set forth below, the Court denies both motions.

## II.     BACKGROUND

Plaintiff Jakob Tiarnan Rumble ("Rumble" or "Plaintiff") filed suit against

Defendant Fairview Health Services, d/b/a Fairview Southdale Hospital ("Fairview"),

and Emergency Physicians, P.A. ("Emergency Physicians"), alleging that the treatment

he received at Fairview from June 23 to June 28, 2013, constitutes discrimination in

violation of Section 1557 of the Affordable Care Act ("ACA"), 42 U.S.C. § 18116, and

the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363A.11.  (See generally

Compl. [Doc. No. 1].)  Specifically, Rumble alleges that "he received worse care [from

both Defendants] . . . because of his status as a transgender man."  (See id. ¶ 3.)

Rumble resides in Hennepin County, Minnesota.  (Id. ¶ 4.)  He was eighteen years

old when he experienced the alleged discrimination by Defendants.  (See Pl.'s Mem. at

10 [Doc. No. 25].)

Defendant Fairview is a "Minnesota-based health care organization receiving

federal and state financial assistance such as credits, subsidies, or contracts of insurance."

(Id. ¶ 6.)  At all times relevant, Fairview owned and operated Fairview Southdale

Hospital, which is located at 6401 France Avenue South, Edina, Minnesota 55435.  (Id. ¶

5.)  Plaintiff alleges that Fairview "employed the services of doctors, nurses, and other

healthcare professional and non-professional health care providers, including the nurses

and other health care providers who cared for Jakob Rumble in June 2013, and held itself

out and warranted itself to the public as competent, careful, and experienced in the care

and treatment of patients."  (Id. ¶ 7.)

Like Fairview, Defendant Emergency Physicians is also a "Minnesota-based

healthcare organization receiving federal and state financial assistance such as credits,

subsidies, or contracts of insurance."  (Id. ¶ 10.)  Emergency Physicians employs the

emergency room physicians who staff Fairview Southdale Hospital.  (Id. ¶ 9.)  Plaintiff

alleges that Randall Steinman, M.D. is one such emergency room physician who is

employed by Defendant Emergency Physicians.  (Id. ¶ 12.)

### A. Terminology Overview

Given the nature of this case, the Court provides an overview of the relevant

terminology before detailing Plaintiff's claims.  Rumble self-identifies as a "female-to-

male transgender man."  (Id. ¶ 4.)  Transgender is "[a]n umbrella term that may be used

to describe people whose gender expression does not conform to cultural norms and/or

whose gender identity is different from their sex assigned at birth.  Transgender is a self-

identity, and some gender nonconforming people do not identify with this term."  See

Trans Bodies, Trans Selves: A Resource for the Transgender Community 620 (Laura

Erickson-Schroth, ed. 2014).  Although Rumble was "labeled female at birth and given a

female birth name," he "identifies as male."  (Compl. ¶ 25 [Doc. No. 1].)

Recently, courts have broadly characterized an individual's transgender status as

part of that individual's "sex" or "gender" identity.  See, e.g., Smith v. City of Salem,

Ohio, 378 F.3d 566, 572–73 (6th Cir. 2004) (holding that plaintiff with gender identity

disorder sufficiently stated constitutional and Title VII sex discrimination claims based

on his allegations that he was discriminated against because of his gender non-

conforming behavior and appearance); Radtke v. Miscellaneous Drivers & Helpers Union

Local No. 638 Health, Welfare, Eye & Dental Fund, 867 F. Supp. 2d 1023, 1032 (D.

Minn. 2012) (explaining that "the 'narrow view' of the term 'sex' in Title VII" in

Sommers v. Budget Mktg., Inc., 667 F.2d 748, 750 (8th Cir. 1982), "'has been

3

eviscerated by <u>Price Waterhouse</u>.'") (quoting <u>Smith</u>, 378 F.3d at 573).

This recent development is a result of the United States Supreme Court's ruling in <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228 (1989), <u>superseded on other grounds by statute as stated in</u> <u>Burrage v. U.S.</u>, 134 S. Ct. 881 (2014).  In <u>Price Waterhouse</u>, the Supreme Court held that Title VII's prohibition against discrimination because of sex includes discrimination based on gender stereotyping.  <u>See</u> 490 U.S. at 250–52.  Because the term "transgender" describes people whose gender expression differs from their assigned sex at birth, discrimination based on an individual's transgender status constitutes discrimination based on gender stereotyping.  Therefore, Plaintiff's transgender status is necessarily part of his "sex" or "gender" identity.

However, an individual's transgender status in no way indicates that person's sexual orientation.  <u>See</u> American Psychological Association, <u>Identification of Terms: Sex, Gender, Gender Identity, Sexual Orientation</u>, <u>available online</u> http://www.apa.org/pi/lgbt/resources/sexuality-definitions.pdf.  Although this principle is factually correct, the State of Minnesota defines "sexual orientation" as including "having or being perceived as having a self-image or identity not traditionally associated with one's biological maleness or femaleness."  <u>See</u> Minn. Stat. § 363A.03, subd. 44. Therefore, solely for purposes of the Court's discussion of Plaintiff's Minnesota state law discrimination claim, the Court considers Plaintiff's gender identity as part of his "sexual orientation."

### B.  Plaintiff's Medical Condition Before Going to Fairview Hospital

Rumble alleges that "[d]uring the week of June 16 to June 22, 2013, [he] saw his

primary care provider with a complaint that his reproductive organs were inflamed and causing him extreme pain." (Compl. ¶ 26 [Doc. No. 1].) Plaintiff has a "uterus, vagina, cervix, and labia."[1] (See id. ¶ 42.) Rumble's primary care physician prescribed a "7-day course of antibiotic treatment." (Id. ¶ 26.) However, Rumble's pain allegedly increased during the course of his antibiotic treatment. (See id. ¶ 27.) In fact, Rumble alleges that he "could hardly walk because of the pain[, and] [w]hen he urinated, he had to grab something to brace himself or bit down on a towel to endure the pain." (Id.)

On June 23, 2013, when the pain had reached this severity, Plaintiff's mother, Jennifer Rumble, took Plaintiff's temperature and determined that he had a one hundred and four degree fever. (Id.) As a medical professional, Jennifer Rumble knew that "800 mg of ibuprofen" is the "highest safe dosage for an adult." (Id. ¶¶ 37, 27.) To treat her son's pain, Jennifer gave Plaintiff 800 mg of ibuprofen. (Id. ¶ 27.) Plaintiff alleges that after he took the ibuprofen, he and his mother went to the emergency room at Fairview Southdale Hospital, which "was the hospital closest to their home." (Id. ¶ 28.)

### C. Treatment Plaintiff Received During Intake

Plaintiff arrived at Fairview at approximately 1 pm on June 23, 2013. (Id.) When checking-in at the front desk, Rumble handed the front desk clerk his driver's permit. (Id. ¶ 29.) At the time, Rumble's driver's permit "incorrectly identified [him] as female." (Id.) The clerk allegedly told Rumble that he could not find Rumble in the computer

---

[1]     Generally, it is offensive and inappropriate to ask anyone, including a transgender individual, whether their genitals correspond with their self-proclaimed gender identity. See Erickson-Schroth, supra, at 265. However, as this case pertains to the medical care that Plaintiff received to treat his genital pain, the Court engages in a discussion about Plaintiff's genitalia.

system, and Rumble responded by telling the clerk his birth name.  (See id.)  The

Fairview clerk told Rumble that Fairview has "female on file," and subsequently gave

Plaintiff a wristband labeled with an "F."  (See id. ¶ 30.)

Plaintiff claims that he was given this "F" wristband even though he told the clerk

that he identifies as male.  (See Pl.'s Mem. at 1 [Doc. No. 25].)  Although Plaintiff's

Complaint does not expressly state that Rumble told the clerk that he identifies as male,

the Court reads Plaintiff's Complaint as alleging that Rumble communicated his gender

identity when he answered the clerk's "preliminary questions."  (See Compl. ¶ 29 [Doc.

No. 1].)  Rumble further alleges that during this exchange with the Fairview clerk, the

clerk "left the front desk to speak to [another] person and held a folder in front of his face

while whispering to this person."  (See id. ¶ 31.)  Rumble believes that these two

individuals were "discussing his gender."  (Id.)

The clerk then took Rumble to an intake nurse in an examining room.  (See id. ¶

32.)  Rumble allegedly registered a temperature of nearly one hundred degrees,

"described the severity of his pain" to the intake nurse, and also told the intake nurse

about his prior one hundred and four degree fever.  (See id. ¶ 32–33.)

After Plaintiff's meeting with the intake nurse, Rumble and his mother were

transferred to another room, where they waited to be seen by a doctor for hours.  (See id.

¶ 35.)  Rumble alleges that he remained in "severe pain" while he waited in this room.

(See id.)  Although Plaintiff and his mother both tried to call a nurse using the call button

in the room, allegedly, no one responded to the call.  (See id.)  In order to gain the

attention of a medical professional in the hospital, Plaintiff claims that his mother would

6

"leave the room and search for emergency room staff." (<u>Id.</u> ¶ 36.) Rumble's mother told

staff members that her son was in severe pain and asked for him to receive pain

medication. (<u>See id.</u> ¶ 35.) Emergency room staff allegedly responded by stating that

"they would need to ask a doctor about [administering or obtaining pain medication for

Rumble]." (<u>See id.</u>) Finally, "[a]fter several hours," Fairview staff gave Plaintiff some

pain medication. (<u>Id.</u> ¶ 36.) Plaintiff and his mother believe that "people with less urgent

medical needs were treated much more quickly than [Rumble] was treated." (<u>Id.</u> ¶ 37.)

### D.  Treatment Plaintiff Received by Emergency Room Doctor

Dr. Randall Steinman finally came to Rumble's room four and a half to five hours

after Rumble initially arrived at the emergency room. (<u>See id.</u> ¶ 38.) Dr. Steinman is

employed by Defendant Emergency Physicians. (<u>See</u> Compl. ¶ 12 [Doc. No. 1].) Dr.

Steinman was accompanied by a female nursing assistant/emergency room technician,

and Dr. Karee Lehrman, an obstetrician-gynecologist. (<u>Id.</u> ¶ 38.) Dr. Steinman allegedly

asked Rumble in a "hostile and aggressive manner," "[w]ho are you having sex with?"

(<u>Id.</u> ¶ 39.) When Rumble asked Dr. Steinman "what he meant by that [question]," Dr.

Steinman asked, "[m]en, women, or both?" (<u>See id.</u> ¶ 40.) Rumble alleges that "Dr.

Steinman seemed angry, and held his face a few inches from [Rumble's] face when he

asked questions." (<u>Id.</u>) In fact, Rumble claims that "Dr. Steinman's manner was so

hostile that [Rumble] felt as if the questions were an attempt to embarrass [Rumble]

rather than to diagnose him." (<u>Id.</u>) For instance, Dr. Steinman allegedly asked Plaintiff if

he was "engaging in penetration," and whether "he'd ever had sex with objects." (<u>See</u>

<u>id.</u>)

After questioning Rumble, Dr. Steinman proceeded with a physical examination of Plaintiff's genitalia.  Plaintiff informed Dr. Steinman that "he was in extreme pain," and asked Dr. Steinman "to please be gentle."  (See id. ¶ 41.)  "Dr. Steinman took a strip of gauze and [allegedly] wiped [Rumble's] labia in a very rough manner."  (Id. ¶ 43.)  In fact, Rumble alleges that he "felt like he was being stabbed," because "[i]t seemed as if [Dr. Steinman] was pressing down as hard as he could."  (Id.)  Dr. Steinman then allegedly "repeatedly jabbed at [Rumble's] genitals with his fingers."  (Id.)  Rumble began to cry from the pain of this exam.  (See id.)

When Dr. Steinman asked "[i]s this what this normally looks like?," Plaintiff "responded that his labia were swollen to almost three times their normal size."  (Id. ¶ 44.)  Dr. Steinman then allegedly stated that "he couldn't tell what was going on because of the male hormones."  (See id.)  Rumble takes prescription hormone medication.  (Id. ¶ 42.)  Throughout the exam, Dr. Steinman "repeated several times that he didn't know what the male hormones [Rumble] was taking were doing to [Rumble's] body," nor did Dr. Steinman know "how much swelling was due to the hormones."  (Id.)

Dr. Steinman proceeded by continuing to jab Plaintiff's genitals.  (Id. ¶ 45.)  Rumble cried out from the pain, and when he could not bear the pain any longer he asked Dr. Steinman to stop the exam, twice.  (See id.)  However, "Dr. Steinman [allegedly] ignored him and did not stop, but continued to forcefully jab at [Rumble's] genitals, causing [Rumble] more pain."  (Id.)  Although Dr. Lehrman and the female nursing assistant/emergency room technician were in the exam room, they did not intervene or stop Dr. Steinman.  (See id. ¶ 48.)

Rumble then asked his mother, "Mom, can you make him stop?"  (Id. ¶ 46.)
Jennifer Rumble responded by allegedly yelling "[s]top!  He said that you needed to stop.
Didn't you hear him?"  (Id.)  At this point, the female nursing assistant/emergency room
technician left the room.  (See id.)  Dr. Steinman finally stopped jabbing Plaintiff's
genitals and Rumble asked whether Dr. Steinman had determined the problem.  Dr.
Steinman allegedly stated in a tense and angry voice, "I can't tell you because your mom
made me stop the exam."  (See id. ¶ 47.)  Without further explanation, Dr. Steinman then
allegedly left the room.  (See id.)

Once both doctors had left Rumble's exam room, Rumble waited in the room for
two additional hours.  (See id. ¶ 49.)  Jennifer Rumble asked emergency room staff if
they often made people wait in the emergency room for nearly seven hours, and the staff
allegedly responded they did not.  (See id. ¶ 50.)  Rumble's mother also asked whether
she and her son could have something to eat.  (See id.)  Although the staff initially stated
that they did not feed people who were in the emergency room, after acknowledging that
the Rumbles had been waiting for nearly seven hours, the staff brought the Rumbles
sandwiches.  (See id.)

### E.  Treatment Plaintiff Received Once Admitted to Fairview

Finally, around 8 pm on June 23, 2014, Plaintiff was admitted to the hospital.  (Id.
¶ 51.)  Jennifer Rumble was later informed by a Fairview hospital doctor that her son
"would have been septic within 12 to 24 hours [from] when [she] brought [her son] in[to
the emergency room] and he could have died."  (Id. ¶ 59.)  Because of the interaction
with Dr. Steinman, Rumble was afraid of being left alone in the hospital.  (Id. ¶ 51.)

9

Rumble's mother shared his fear, as "[s]he did not know what might happen if she was

not present."  (<u>Id.</u> ¶ 52.)  Therefore, Rumble's mother stayed in the hospital with her son

for his entire stay, and she spent nights sleeping on a chair.  (<u>Id.</u>)

Rumble was in the hospital for six days.  (<u>Id.</u> ¶ 62.)  While he was a patient, he

had his own private room.  (<u>Id.</u> ¶ 54.)  On a dry erase board on the wall across from the

foot of Rumble's bed, Fairview staff tracked the names of Rumble's on-duty nursing

staff, his reported pain levels, and the names and specialties of his treating physicians.

(<u>See</u> <u>id.</u>)  One of Rumble's treating physicians was Dr. Lehrman, the same doctor who

was present during Rumble's interaction with Dr. Steinman.  (<u>See</u> <u>id.</u>)  The dry erase

board indicated that Dr. Lehrman is an "OB/GYN."  (<u>See</u> <u>id.</u>)  Rumble alleges that he

was "upset and embarrassed by Defendant Fairview's disclosure on the dry erase board[,]

that he was being treated by an 'OB/GYN[,]' to non-medical personnel such as dietary

and housekeeping/environmental services and any personal guests to his room."  (<u>See</u> <u>id.</u>

¶ 55.)  Accordingly, Rumble's mother erased the "OB/GYN" notation with her finger

after observing her son's discomfort with the visible information.  (<u>See</u> <u>id.</u>)  Rumble

alleges that this visible notation was unnecessary because "all medical professionals

treating [Plaintiff] would have had access to the same information on his charts."  (<u>Id.</u>)

In addition to Dr. Lehrman, Rumble was assigned an infectious disease doctor, Dr.

Stephen Obaid.  (<u>See</u> <u>id.</u> ¶ 56.)  Dr. Obaid examined Rumble around 7 am on June 24,

2013.  (<u>Id.</u>)  Dr. Obaid examined Plaintiff's genital area while wearing gloves, then wiped

his gloves on the blanket on Rumble's bed, and proceeded to examine Rumble's eyes and

mouth using the same gloves.  (<u>See</u> <u>id.</u>)  Rumble "later developed sores on his face in the

places that Dr. Obaid had touched." (Id.)

In addition to the lack of sanitary or hygienic precautions taken by Dr. Obaid, Plaintiff alleges that he was mistreated by the nurses at Fairview. (See id. ¶¶ 57–58.) For instance, Rumble claims that "some of the nurses were hostile towards him because they seemed tense and avoided speaking to him when they came into his room." (Id. ¶ 57.) Additionally, at the beginning of each nurse's shift, the nurse would examine his genitals. (Id.) Rumble asked one nurse why the nurses needed to conduct this exam, and the nurse responded that it was simply "completely necessary," without elaborating further. (Id.) Rumble also asked this nurse if she knew what was wrong and she responded that "I don't know because I don't have any experience with this sort of thing." (Id. ¶ 58.) Rumble believes that the nurse implied that she had no experience with transgender patients. (Id.)

Although Rumble was initially treated with antibiotics when he was admitted to the hospital, he "did not appear to be getting any better." (Id. ¶ 53.) Therefore, Rumble's mother decided to complete her own research and she "searched the internet to get information about what might be wrong." (Id. ¶ 60.) As a result of her research, she asked Dr. Obaid if her son may have a sexually-transmitted infection. (Id.) After this suggestion, Dr. Obaid swabbed Rumble's genitals for testing, and informed Rumble's mother that "it would be a week before they had the lab results." (Id. ¶ 61.) Nonetheless, Fairview staff began to treat Rumble with a different medication and his medical condition began to improve. (Id.) After two days on the new medicine, Rumble asked to be discharged. (Id. ¶ 62.) Although Rumble believed that he could have improved more

from staying longer in the hospital, "he did not feel safe at the hospital and preferred to leave." (Id.)  Rumble was released from the hospital on Friday, June 28, 2013.  (Id.)

## F.  Aftermath from Plaintiff's Treatment at Fairview

A few weeks later, Rumble received a bill from Emergency Physicians, the group that employs Dr. Steinman.  (Id. ¶ 63.)  The bill was in regards to his emergency room visit at Fairview Southdale Hospital.  (Id.)  "The bill indicated [that] no insurance payments were pending and [Rumble] owed the full amount.  In the billing description for the time he had spent at Fairview Southdale Hospital, it stated, 'THE DIAGNOSIS IS INCONSISTENT WITH THE PATIENT'S GENDER.'"  (Id.)  In contrast to the statement on this bill, Plaintiff alleges that his ultimate diagnoses were conditions that can, and do, affect people of any sex or gender.[2]  (Id.)

As a result of his experience with Defendants, Plaintiff fears doctors and "refuses to visit a hospital or doctor's office alone."  (Id. ¶ 64.)  Additionally, Rumble claims that he will never go to Fairview Southdale Hospital again, "even in an emergency" although it is the nearest hospital to his home.  (Id. ¶ 65.)

The Court also notes that on December 12, 2013, Plaintiff filed a complaint of discrimination with the Office for Civil Rights ("OCR") in the Department of Health and Human Services alleging that Defendants violated his rights under Section 1557 of the ACA.  (Id. ¶ 67.)  "The OCR is responsible for ensuring compliance with Section 1557.

---

[2]      Plaintiff does not allege that he incurred expenses because of the insurance company's initial denial of coverage.  (See generally Compl. [Doc. No. 1]; Def. Emergency Physicians' Reply at 2 [Doc. No. 29].)  Rather, Plaintiff only argues that the language further substantiates his federal and state law discrimination claims.

Region V of [the] OCR is responsible for investigating and remedying violations of

Section 1557 that occur in Minnesota, where Fairview Southdale Hospital is located."

(Id.)  The OCR's investigation of this matter is allegedly ongoing.

### G. Plaintiff's Claims

Plaintiff's Complaint states two counts against Defendants.  In Count I, Plaintiff

alleges that Defendants discriminated against him on the basis of sex, in violation of

Section 1557 of the ACA.[3]  (See id. ¶¶ 69–76.)  According to Section 1557:

> Except as otherwise provided for in this title (or an amendment made by
> this title), an individual shall not, on the ground prohibited under title VI of
> the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.), *title IX of the
> Education Amendments of 1972 (20 U.S.C. 1681 et seq.)*, the Age
> Discrimination Act of 1975 (42 U.S.C. 6101 et seq.), or section 504 of the
> Rehabilitation Act of 1973 (29 U.S.C. 794), be excluded from participation
> in, be denied the benefits of, or be subjected to discrimination under, any
> health program or activity, any part of which is receiving Federal financial
> assistance, including credits, subsidies, or contracts of insurance, or under
> any program or activity that is administered by an Executive Agency or any
> entity established under this title (or amendments). The enforcement
> mechanisms provided for and available under such title VI, title IX, section

---

[3]     Section 1557 provides Plaintiff with a private right of action to sue Defendants.
The Court reaches this conclusion because the four civil rights statutes that are referenced
and incorporated into Section 1557 permit private rights of action.  See Gonzaga Univ. v.
Doe, 536 U.S. 273, 283–84 (2002) (holding that "Title VI . . . and Title IX . . . create
individual rights because those statutes are phrased 'with an *unmistakable focus* on the
benefited class'") (emphasis added); Barnes v. Gorman, 536 U.S. 181, 185 (2002)
(finding that section 504 of the Rehabilitation Act is "enforceable through private causes
of action" because the statutory language of section 504 mirrors Title VI); 42 U.S.C. §
6104(e)(1) (the Age Discrimination Act of 1975 states that "any interested person [may]
bring [an action] in any United States district court for the district in which the defendant
is found or transacts business to enjoin a violation of this Act . . . [and] [s]uch interested
person may elect, by a demand for such relief in his complaint, to recover reasonable
attorney's fees, in which case the court shall award the costs of suit, including a
reasonable attorney's fee, to the prevailing plaintiff.").  Because Section 1557 states that
the enforcement mechanisms available under those four statutes apply to violations of
Section 1557, Section 1557 necessarily also permits private causes of action.

504, or such Age Discrimination Act shall apply for purposes of violations
of this subsection.

See 42 U.S.C. § 18116 (emphasis added).  Accordingly, Defendants, who both allegedly

received federal financial assistance, may not discriminate against Plaintiff on the basis

of "sex," as Title IX prohibits discrimination on this "ground."  See id.

When analyzing Title IX, courts have interpreted the term "sex" to include

"individuals who are perceived as not conforming to gender stereotypes and

expectations."  (See Compl. ¶ 72 (citing Kastl v. Maricopa Cnty. Community College

Dist., No. 02-cv-1531 (PHX/SRB), 2004 WL 2008954, at *2 (D. Ariz. June 3, 2004)

(stating that "[i]t is well settled that Title VII's prohibition on sex discrimination

encompasses discrimination against an individual for failure to conform to sex

stereotypes."), and Miles v. New York University, 979 F. Supp. 248, 250 n.4 (S.D.N.Y.

1997) (explaining that "the Title IX term 'on the basis of sex' is interpreted in the same

manner as similar language in Title VII")) [Doc. No.1].)  Furthermore, Leon Rodriguez,

the Director of the OCR, stated in an agency opinion letter that Section 1557 of the ACA

"extends to claims of discrimination based on gender identity or failure to conform to

stereotypical notions of masculinity or femininity."  (See Barrett Wiik Decl., Ex. C [Doc.

No. 26-1].)  Accordingly, Plaintiff alleges that, in direct violation of Section 1557,

"Defendants perpetrated discrimination[, based upon Rumble's gender identity or

transgender status,] with malice, deliberate disregard for, or deliberate reckless

indifference to Plaintiff's rights."  (Compl. ¶ 75 [Doc. No. 1].)

In Count II, Plaintiff alleges that Defendants' conduct violated the MHRA, Minn.

Stat. § 363A.11.  (See id. ¶¶ 77–82.)  Pursuant to the MHRA, it is an "unfair

discriminatory practice:"

> to deny any person the full and equal enjoyment of the goods, services,
> facilities, privileges, advantages, and accommodations of a place of public
> accommodation because of race, color, creed, religion, disability, national
> origin, marital status, *sexual orientation*, or sex . . .

See Minn. Stat. § 363A.11, subd. 1(a)(1) (emphasis added).  As noted above, Minnesota

law defines "sexual orientation" as "having or being perceived as having a self-image or

identity not traditionally associated with one's biological maleness or femaleness."  See

Minn. Stat. § 363A.03, subd. 44.  Plaintiff claims that, under the MHRA, he is protected

from discrimination based on his gender identity and transgender status, "since those are

subsumed under the statutory definition of 'sexual orientation.'"  (Compl. ¶ 79 [Doc. No.

1].)

Plaintiff seeks: (1) a permanent injunction requiring that "Defendants adopt

practices in conformity with the requirements of [Section 1557] and [the MHRA]" and

"prohibiting Defendants from engaging in the practices complained of [by Plaintiff];" (2)

compensatory damages "for his physical pain, embarrassment, humiliation, emotional

pain and anguish, violation of his dignity, and loss of enjoyment of life;" and (3) punitive

damages, "to the extent allowed by state and federal anti-discrimination law."  (See id. at

16.)

### H. Procedural Posture

Plaintiff filed his Complaint on June 20, 2014.  (See generally Compl. [Doc. No.

1].)  On July 18, 2014, Defendant Emergency Physicians filed a Motion to Dismiss [Doc.

15

No. 11], with a supporting memorandum [Doc. No. 13].  Similarly, Defendant Fairview filed a Motion to Dismiss [Doc. No. 18] and a supporting memorandum [Doc. No. 20] on July 18, 2014.  Plaintiff filed a single response brief in opposition to both Defendants' motions [Doc. No. 25], with a declaration and several supporting exhibits [Doc. No. 26].  Defendant Fairview then filed a reply brief on October 17, 2014 [Doc. No. 28], and Defendant Emergency Physicians did the same [Doc. No. 29].  The Court heard oral argument on both motions on November 14, 2014.  (See Minute Entry [Doc. No. 30].)

## III.   DISCUSSION

### A.  Standard of Review

Defendants move to dismiss Plaintiff's Complaint, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, for failure to state a claim upon which relief can be granted.  When evaluating a motion to dismiss, the Court assumes the facts in the Complaint to be true and construes all reasonable inferences from those facts in the light most favorable to Plaintiff.  Morton v. Becker, 793 F.2d 185, 187 (8th Cir. 1986).  However, the Court need not accept as true wholly conclusory allegations, Hanten v. School District of Riverview Gardens, 183 F.3d 799, 805 (8th Cir. 1999), or legal conclusions Plaintiff draws from the facts pled, Westcott v. City of Omaha, 901 F.2d 1486, 1488 (8th Cir. 1990).  In addition, the Court ordinarily does not consider matters outside the pleadings on a motion to dismiss.  See Fed. R. Civ. P. 12(d).  The Court may, however, consider exhibits attached to the complaint and documents that are necessarily embraced by the pleadings, Mattes v. ABC Plastics, Inc., 323 F.3d 695, 697 n.4 (8th Cir. 2003), and may also consider public

records, Levy v. Ohl, 477 F.3d 988, 991 (8th Cir. 2007).[4]

To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). Although a complaint need not contain "detailed factual allegations," it must contain facts with enough specificity "to raise a right to relief above the speculative level." Id. at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," will not pass muster. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 555). In sum, this standard "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim]." Twombly, 550 U.S. at 556.

### B. Defendant Emergency Physicians' Motion to Dismiss

Defendant Emergency Physicians argues that the Court should dismiss (1) Plaintiff's Count I because (a) Rumble failed to allege that he sought medical care from a health program or activity that receives federal funds, and (b) Plaintiff does not allege facts supporting either an adverse action or differential treatment on the basis of sex (see Def. Emergency Physicians' Mem. at 8, 9 [Doc. No. 13]); and (2) Plaintiff's Count II because (a) Plaintiff "does not assert facts to demonstrate that [Emergency Physicians] denied Plaintiff any service, facility, privilege, advantage, or accommodation of any public accommodation," and (b) Plaintiff does "not assert facts to show that [Emergency

---

[4]     In his Complaint, Rumble references two publicly-available documents that contain data and statistics about the discrimination transgender and gender non-conforming individuals face in health care settings, and a third document that constitutes federal agency correspondence relating to Section 1557. (See Compl. ¶¶ 19, 73 [Doc. No. 1].) The Court references these documents as needed throughout the Order.

Physicians] discriminated against Plaintiff because of Plaintiff's sexual orientation and gender identity" (see id. at 13–14.)  The Court disagrees.

### 1.  Count I: Section 1557 Claim

To the Court's knowledge, this is the first case that requires interpretation of Section 1557.  As this is a matter of first impression, the canons of statutory interpretation guide the Court's analysis.  Statutory interpretation begins with the statute's "plain language."  See United States v. Cacioppo, 460 F.3d 1012, 1016 (8th Cir. 2006); Lamie v. U.S. Trustee, 540 U.S. 526, 534 (2004) (explaining that when a "statute's language is plain," courts must enforce it "according to its terms.").  "Where the language is plain, [the Court] need inquire no further."  Cacioppo, 460 F.3d at 1016 (citing United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241 (1989)).  In other words, if the statutory text is unambiguous, then the Court need not look to an agency's interpretation of the statute, nor look to the statute's legislative history.  See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844 (1984); Horras v. Leavitt, 495 F.3d 894, 900 (8th Cir. 2007); Degnan v. Sebelius, 658 F. Supp. 2d 969, 970–71 (D. Minn. 2009).  However, "[i]f the language of the statute is ambiguous or silent, the issue for the court is whether the agency's interpretation of the statute is a reasonable one."  See Degnan, 658 F. Supp. 2d at 970–71 (citing Smiley v. Citibank, N.A., 517 U.S. 735, 744–45 (1996)).

Section 1557 references and incorporates four different civil rights statutes: Title VI, which prohibits discrimination on the basis of race, color, and national origin; Title IX, which prohibits discrimination on the basis of sex; the Age Discrimination Act,

18

which prohibits discrimination on the basis of age; and section 504 of the Rehabilitation Act, which prohibits discrimination on the basis of disability.  See 42 U.S.C. § 18116. The parties appear to disagree about the extent to which, or the manner in which, these four civil rights statutes are incorporated into Section 1557.  The Court reads Section 1557 as referencing these four statutes to list "the ground[s]" on which discrimination is prohibited in a health care setting.  See id. (stating that "an individual shall not, on the ground prohibited under [the four civil rights statutes] be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity").

Although the four civil rights statutes provide the separate and distinct grounds or bases on which discrimination is prohibited, the Court finds that the language of Section 1557 is ambiguous, insofar as each of the four statutes utilize different standards for determining liability, causation, and a plaintiff's burden of proof.  See 42 U.S.C. § 18116. Therefore, the Court looks to agency interpretation for some guidance.

The Department for Health and Human Services ("HHS") is responsible for promulgating regulations pursuant to Section 1557 and the OCR, a sub-agency of HHS, is responsible for enforcing compliance with Section 1557.  Here, all parties agree that HHS and/or the OCR have yet to promulgate any rules or regulations interpreting Section 1557.  (See Pl.'s Mem. at 9 [Doc. No. 25]; Def. Fairview's Reply at 3 [Doc. No. 28].)

Although the OCR has yet to promulgate formal regulations interpreting Section 1557, Plaintiff emphasizes that in an opinion letter, Leon Rodriguez, the Director of the OCR, stated that Section 1557 of the ACA "extends to claims of discrimination based on

19

gender identity or failure to conform to stereotypical notions of masculinity or femininity" and prohibits "discrimination regardless of the actual or perceived sexual orientation or gender identity of the individuals involved." (See Barrett Wiik Decl., Ex. C [Doc. No. 26-1].)  In In re Union Pac. R.R. Employment Practices Litig., the Eighth Circuit held that "[a]n agency's interpretation that is found in an opinion letter . . . 'lack[s] the force of law' and is not entitled to deference under Chevron, 467 U.S. 837 (1984)." See 479 F.3d 936, 943 (8th Cir. 2007).  Thus, Defendant Fairview correctly states that Rodriguez's opinion letter is not controlling on the Court. (See Def. Fairview's Reply at 3 [Doc. No. 28].)

Nonetheless, the Court may still determine that the OCR's interpretation is persuasive under Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944).  The weight that the Court places on the OCR's interpretation in its opinion letter is based on "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." Skidmore, 323 U.S. at 140.  Here, the Court finds the OCR's interpretation of Section 1557 persuasively concludes that Section 1557 protects plaintiffs, like Rumble, who allege discrimination based on "gender identity." (See Barrett Wiik Decl., Ex. C [Doc. No. 26-1].)[5]

---

[5]     As further evidence that Section 1557 applies to plaintiffs alleging discrimination based on gender identity, Plaintiff points to an OCR Bulletin that details two investigations involving alleged sex discrimination. (See Pl.'s Mem. at 9 [Doc. No. 25].) Defendant Fairview argues that the persuasive effect of the two investigations detailed in the bulletin is minimal because the investigations did not develop into administrative or judicial adjudications. (See Def. Fairview's Reply at 3 [Doc. No. 28].)  The Court

While the OCR expresses an opinion about whether Section 1557 prohibits discrimination based on gender identity, the agency currently provides no guidance about the evidentiary or causation standards to apply to Section 1557 cases. Defendants contend that different statutory standards should apply depending upon the Section 1557 plaintiff's class status. For instance, Defendants argue that Title IX standards should apply to Plaintiff because his claim is based on discrimination because of sex. (See Def. Emergency Physicians' Mem. at 7–9 [Doc. No. 13]; Def. Fairview's Mem. at 9–13 [Doc. No. 20].) Plaintiff disagrees, and claims that the courts should apply a singular, uniform standard, regardless of the plaintiff's protected class status. (See Pl.'s Mem. at 22–27 [Doc. No. 25].)

Although the Court interprets Section 1557 in order to include "every word and clause" in its interpretation, the Court "must not be guided by a single sentence or member of a sentence, but look to the provision of the whole law, and to its object and policy." Hennepin Cnty. Med. Ctr. v. Shalala, 81 F.3d 743, 748 (8th Cir. 1996) (quoting U.S. National Bank of Oregon v. Independent Insurance Agents, 508 U.S. 439, 455 (1993)). Here, looking at Section 1557 and the Affordable Care Act as a whole, it appears that Congress intended to create a new, health-specific, anti-discrimination cause of action[6] that is subject to a singular standard, regardless of a plaintiff's protected class

disagrees. Rather, it concludes that the OCR's investigation of these two cases is consistent with the OCR's opinion letter insofar as the letter stated that Section 1557 "extends to claims of discrimination based on . . . failure to conform to stereotypical notions of masculinity or femininity." (See Barrett Wiik Decl., Ex. C [Doc. No. 26-1].)

[6]     Commentators have noted that Section 1557 "does not merely extend Title VI to

status.

Reading Section 1557 otherwise would lead to an illogical result, as different enforcement mechanisms and standards would apply to a Section 1557 plaintiff depending on whether the plaintiff's claim is based on her race, sex, age, or disability. For instance, a plaintiff bringing a Section 1557 race discrimination claim could allege only disparate treatment, but plaintiffs bringing Section 1557 age, disability, or sex discrimination claims could allege disparate treatment or disparate impact.  See Alexander v. Sandoval, 532 U.S. 275, 293 (2001) (holding that no private right of action exists to enforce disparate impact regulations under Title VI); Alexander v. Choate, 469 U.S. 287, 299 (1985) ("assum[ing] without deciding that § 504 [of the Rehabilitation Act] reaches at least some conduct that has an unjustifiable disparate impact upon the handicapped"); see also Sharif v. N.Y. State Educ. Dep't, 709 F. Supp. 345, 361 (S.D.N.Y. 1989) (holding that Title IX permits disparate impact suits).

Similarly, a plaintiff bringing a Section 1557 age discrimination claim would have to exhaust administrative remedies and would be barred from recovering damages, but plaintiffs bringing Section 1557 race, disability, or sex discrimination claims would not

---

additional health programs; [rather,] it creates a new civil right and remedy while leaving in place Title VI and other existing civil rights laws."  See Sidney D. Watson, Section 1557 of the Affordable Care Act: Civil Rights, Health Reform, Race and Equity, 55 How. L. J. 855, 870 (2012); Sarah G. Steege, Finding a Cure in the Courts: A Private Right of Action for Disparate Impact in Health Care, 16 Mich. J. Race & L. 439, 456–59 (2011). The Court agrees with this observation.  In fact, Section 1557 expressly states that "[n]othing in this title . . . shall be construed to invalidate or limit the rights, remedies, procedures, or legal standards available to individuals aggrieved under [any of the four existing civil rights statutes]."  See 42 U.S.C. § 18116 (b).  Thus, Congress likely intended to create a new right and remedy in a new context without altering existing laws.

have to exhaust administrative remedies and would not be barred from recovering

damages.  Compare 42 U.S.C. § 2000d-1(1), 20 U.S.C. § 1682 (2006), and 29 U.S.C. §

794 (2006), with 42 U.S.C. § 6104(f); see Gebser v. Lago Vista Indep. Sch. Dist., 524

U.S. 274, 285–90 (1998) (requiring actual knowledge of discrimination for monetary

damages in a Title IX case); Franklin v. Gwinnett Cnty. Pub. Sch., 503 U.S. 60, 71–72

(1992) (holding that compensatory damages are available in a Title IX action alleging

intentional discrimination); Guardians Ass'n v. Civil Serv. Comm'n of City of New

York, 463 U.S. 582, 595–96 (1983) (holding that compensatory relief in a Title VI action

is only available upon a showing of intentional discrimination).

Plaintiff recognizes the absurd inconsistency that could result if the Court

interpreted Section 1557 as Defendants do.  (See Pl.'s Mem. at 22–27 [Doc. No. 25].)

Rumble also aptly notes that if different standards were applied based on the protected

class status of the Section 1557 plaintiff, then courts would have no guidance about what

standard to apply for a Section 1557 plaintiff bringing an intersectional discrimination

claim. [7]  (See id. at 23.)

However, the Court does not intend to imply that Congress meant to create a new

---

[7]     Intersectional discrimination claims are based on the intersectionality of at least
two of a plaintiff's protected class statuses.  Professor Cheryl I. Harris explains that:
>    The particular experience of black women in the dominant cultural
>    ideology of American society can be conceptualized as intersectional.
>    Intersectionality captures the way in which the particular location of black
>    women in dominant American social relations is unique and in some senses
>    unassimilable into the discursive paradigms of gender and race domination.
See Cheryl I. Harris, Whiteness As Property, 106 Harv. L. Rev. 1709, 1791 (1993)
(internal quotation and citation omitted).

anti-discrimination framework that is completely "unbound by the jurisprudence of the four referenced statutes." (Cf. Def. Fairview's Reply at 4 [Doc. No. 28].) Nonetheless, given the inconsistency that would result if the Court interpreted Section 1557 as Defendants do, the Court holds that Congress likely referenced the four civil rights statutes mainly in order to identify the "ground[s]" on which discrimination is prohibited – i.e., race, sex, age, and disability. Congress also likely intended that the same standard and burden of proof to apply to a Section 1557 plaintiff, regardless of the plaintiff's protected class status. To hold otherwise would lead to "patently absurd consequences," United States v. Brown, 333 U.S. 18, 27 (1948), that "Congress could not possibly have intended," F.B.I. v. Abramson, 456 U.S. 615, 640 (1982) (O'Connor, J., dissenting). But, as the Court discusses in more detail below, at this stage of the proceedings, it need not determine the precise standard to apply to Plaintiff's Section 1557 claim.

### a. Covered Health Program or Activity

Defendant Emergency Physicians claims that Rumble "never alleges facts to show he sought medical care from [Emergency Physicians] pursuant to a [f]ederally funded or administered 'health program or activity.'" (See Def. Emergency Physicians' Mem. at 8 [Doc. No. 13].) Defendant misstates the relevant legal standard for determining which entities are covered by Section 1557. According to the ACA, entities that are subject to the anti-discrimination provisions in Section 1557 include "any health program or activity, *any part* of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance," or "any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments)." See 42

24

U.S.C. § 18116 (emphasis added).  Thus, as long as part of an organization or entity

receives federal funding or subsidies of some sort, the entire organization is subject to the

anti-discrimination requirements of Section 1557.  A potential plaintiff need not seek

medical care specifically from the part of the organization that receives federal funding.

(Cf. Def. Emergency Physicians' Mem. at 8 [Doc. No. 13]); see Civil Rights Restoration

Act, Pub. L. No. 100–259, § 382, 102 Stat. 28, 28–29 (1988) (overturning the United

States Supreme Court's decision in Grove City Coll. v. Bell, 465 U.S. 555, 556 (1984), to

clarify that the civil rights laws reached an institution, as a whole, even if only part of the

institution received federal funding).  Rather, the organization is only required to have a

health program or activity that receives federal financial assistance.

Here, Plaintiff alleges that Emergency Physicians is a "Minnesota-based

healthcare organization [that] receiv[es] federal and state financial assistance such as

credits, subsidies, or contracts of insurance."  (Compl. ¶ 10 [Doc. No. 1].)  In his brief,

Plaintiff argues that because Emergency Physicians allegedly receives Medicare and

Medicaid funds, it is "a covered entity" for purposes of Title VI and the Rehabilitation

Act, which are referenced by Section 1557.  (Pl.'s Mem. at 18 [Doc. No. 25].)  "The

parties have not cited, and the Court has not found, any cases from the Eighth Circuit

dealing with the issue of whether Medicare/Medicaid payments to a hospital are

sufficient to create Title VI liability."  Bissada v. Arkansas Children's Hosp., No.

4:08CV00362 (JLH), 2009 WL 1010869, at *11 (E.D. Ark. Apr. 14, 2009) aff'd, 639

F.3d 825 (8th Cir. 2011); see also Bowen v. Am. Hosp. Ass'n, 476 U.S. 610, 624 n.9

(1986) (declining "to review the [Second Circuit] Court of Appeals' assumption that the

provision of health care to infants in hospitals receiving Medicare or Medicaid payments

is a part of a 'program or activity receiving Federal financial assistance.'").

Nonetheless, courts outside the Eighth Circuit have resoundingly held that

Medicare and Medicaid payments constitute federal financial assistance for, at least, the

purposes of section 504 and Title VI.[8]  See, e.g., United States v. Baylor Univ. Med. Ctr.,

736 F.2d 1039, 1042 (5th Cir. 1984) (holding that "Medicare and Medicaid are federal

financial assistance for the purpose of Section 504 [of the Rehabilitation Act], and that

the district court did not err in defining inpatient and emergency room services as the

'program or activity' that would be the appropriate target of HHS's investigation as the

result of the alleged violation of Section 504."); NAACP v. Medical Center, Inc., 599

F.2d 1247, 1248 n.4 (3d Cir. 1979), aff'd in relevant part, 453 F. Supp. 280, later

proceeding, 453 F. Supp. 330 (D. Del. 1978), (affirming district court's determination

that hospital's receipt of Medicare, Medicaid, and unspecified "other" assistance

triggered Section 504 and Title VI); United States v. University Hosp. of State Univ. of

---

[8]      Moreover, courts must generally "accord great weight to the longstanding
interpretation placed on a statute by an agency charged with its administration."  NLRB
v. Bell Aerospace Co. Div. of Textron Inc., 416 U.S. 267, 275 (1974).  "The Department
of Health, Education and Welfare (the predecessor to the Department of Health and
Human Services) expressly included Medicare and Medicaid as programs covered by
Title VI, see 38 Fed. Reg. 17982 (1973); 40 Fed. Reg. 18173 (1975), and HHS's
regulations continue to list these programs among those covered by Title VI."  United
States v. Baylor Univ. Med. Ctr., 736 F.2d 1039, 1047 (5th Cir. 1984) (citing 45 C.F.R.
Part 80, Appendix A at Part 1, # 121 and Part 2, # 30).  Additionally, "[t]he Department's
regulations implementing Section 504 expressly state that service providers whose only
source of federal financial assistance is Medicaid 'should be regarded as recipients under
the statute and the regulation and should be held individually responsible for
administering services in a non-discriminatory fashion.'"  Baylor, 736 F.2d at 1047
(citing 45 C.F.R. Part 84, App. A, Subpart A(1)).

N.Y. at Stony Brook, 575 F. Supp. 607, 612–13 (E.D.N.Y. 1983), aff'd on other grounds,

729 F.2d 144, 151 (2d Cir. 1984) (holding that legislative history reveals Medicare and

Medicaid are "federal financial assistance" for purposes of § 504); United States v.

Cabrini Medical Center, 639 F.2d 908, 910 (2d Cir. 1981) (holding that, under the

Rehabilitation Act, Medicare and Medicaid payments constitute "federal financial

assistance" if the payments are used for employment purposes); Bob Jones University v.

Johnson, 396 F. Supp. 597, 603 n.21 (D.S.C. 1974), aff'd without opinion, 529 F.2d 514

(4th Cir. 1975) (holding that Medicare and Medicaid constitute federal financial

assistance for Title VI purposes).  Because Section 1557 relies on and incorporates

section 504 and Title VI, the Court finds that Medicare and Medicaid payments received

by Emergency Physicians constitute federal financial assistance for the purpose of

Section 1557 as well.

In order for the Medicare and Medicaid funds to qualify as "federal financial

assistance" relevant for section 504 and Title VI, a civil rights plaintiff is regularly

required to demonstrate that the Medicare and Medicaid funds were used for a particular

purpose.  Specifically, "[a] number of cases have held . . . that a Title VI plaintiff must

show that the received funds were used for employment."  Bissada, 2009 WL 1010869, at

*11; see Valentine v. Smith, 654 F.2d 503, 512 (8th Cir. 1981) (dismissing the plaintiff's

Title VI claim because she failed to show that the university defendant used its federal

assistance for the purpose of providing faculty employment); see also Mass v. Martin

Marietta Corp., 805 F. Supp. 1530, 1542 (D. Colo. 1992) (explaining that a Title VI

plaintiff must also demonstrate that the federal government received no goods or services

27

in return for the Medicare or Medicaid payments).  Similarly, a section 504 plaintiff must also demonstrate that "a primary objective for the federal funds" must be "to provide for the employment" of staff.  See Simon v. St. Louis Cnty., Mo., 656 F.2d 316, 319 (8th Cir. 1981) (holding that because the record demonstrated that "a primary objective for the federal funds going to the St. Louis County Police Department is to provide for the employment of commissioned police officers," the "district court properly concluded that Simon had standing to bring a suit under section 504.").

However, a civil rights plaintiff is not required to substantively prove how the funds were used until summary judgment or trial.  See Muller v. Hotsy Corp., 917 F. Supp. 1389, 1418 (N.D. Iowa 1996) (granting summary judgment for the defendant on the plaintiff's section 504 claim because the plaintiff failed to show that the government's intention was to subsidize the defendant, as opposed to compensate the defendant for its goods and services); Bissada, 2009 WL 1010869, at *12 (granting summary judgment for the defendant on the plaintiff's Title VI claim because the plaintiff failed to show that the federal assistance received by the defendant was used directly to provide employment for its physicians); Simon, 656 F.2d at 319 (affirming the district court's ruling that the section 504 plaintiff met his burden of proof during trial that the federal funds were used for employment purposes).  Rather, Rumble must only allege facts that "raise a reasonable expectation that discovery will reveal evidence" that substantiates his claim that Emergency Physicians received federal funds, which were used for employment purposes.  See Twombly, 550 U.S. at 556.

In sum, Plaintiff is not required to demonstrate that he sought medical care from

28

Emergency Physicians through one of Defendant's federally funded or administered health programs or activities.  Because Plaintiff alleges that Emergency Physicians receives federal funds and is subject to Section 1557, the Court plausibly assumes that the federal funds were used for employment purposes.  As explained above, Rumble could only substantiate his claim further with the benefit of discovery.   Accordingly, the Court finds that Defendant Emergency Physicians is subject to the anti-discrimination provisions in Section 1557.[9]

### b.  Adverse Action or Differential Treatment on the Basis of Sex

In addition to arguing that Plaintiff failed to show that he sought medical care from a federally funded health program, Defendant Emergency Physicians argues that Plaintiff's Count I should be dismissed because he failed to show that Emergency Physicians took an adverse action against him or treated him differently because of his transgender status.  (See Def. Emergency Physicians' Mem. at 8–9 [Doc. No. 13].) Specifically, Defendant argues that Rumble must establish that Emergency Physicians, through its employee, Dr. Steinman, had "discriminatory intent."  (See id. at 10.) Defendant's basis for their argument is an Eighth Circuit case interpreting the intent standard required for a Title IX sex discrimination claim.  (See id. at 9.)

In contrast, Plaintiff argues that the Court need not determine whether the Title IX

---

[9]      Moreover, the Court notes that the fact that the OCR initiated an investigation of an emergency department in New Orleans, Louisiana, as part of its enforcement of Section 1557, demonstrates that at least one emergency room facility, which likely received Medicare and Medicaid payments from the federal government, qualified as an entity that was subject to the anti-discrimination mandate of Section 1557.  (See Pl.'s Mem. at 10 n.3 [Doc. No. 25].)

standard should apply to Plaintiff's Section 1557 claim.  (See Pl.'s Mem. at 34 [Doc. No. 25].)  Alternatively, Plaintiff argues that even if the Court were to apply the Title IX standard, Rumble's Complaint meets the intent standard.  (See id.)  The Court agrees with Plaintiff that it need not decide whether the Title IX standard applies to Rumble's Section 1557 claim at this stage in the litigation.  Rather, the Court holds that even if the Title IX standard applies, Plaintiff alleges a plausible Section 1557 claim.

### i.     Adverse Action or Differential Treatment

Defendant Emergency Physicians contends that Rumble failed to plead that Dr. Steinman's actions amount to an "adverse action" or "differential treatment" that is prohibited by Section 1557.  (See Def. Emergency Physicians' Mem. at 9 [Doc. No. 13].)  The Court disagrees.  According to Section 1557, a covered entity, such as Emergency Physicians, may not exclude an individual from being a patient in the hospital, deny the individual the benefits of being a patient, or subject the individual to discrimination, on the basis of sex.  See 42 U.S.C. § 18116.  Therefore, in order for Dr. Steinman's action to rise to an actionable level, he must have either excluded Rumble from receiving medical care at the hospital, denied Rumble the benefits of medical care at the hospital, or otherwise discriminated against him.  See id.  The Court finds that Plaintiff alleges facts sufficiently demonstrating that Dr. Steinman discriminated against Rumble, and denied Rumble the benefits of medical care that he was entitled to as a patient in the emergency room at Fairview Southdale Hospital.

Dr. Steinman allegedly treated Rumble with hostility and aggression while asking him pointed questions that were allegedly meant to embarrass Rumble.  (See Compl. ¶¶

39–40 [Doc. No. 1].)  These questions included asking Plaintiff whether he was having sex with men or women, engaging in penetration, and whether he had ever had sex with objects.  (See id.)  Dr. Steinman also allegedly made disparaging comments about Rumble's use of hormones, and Dr. Steinman aggressively communicated that he was unsure whether Rumble's genital inflammation was caused by the hormones.  (Id. ¶ 44.) Therefore, although Dr. Steinman did not expressly "mock[] or criticize[]" Rumble's transgender status (cf. Def. Emergency Physicians' Mem. at 11 [Doc. No. 13]; Def. Emergency Physicians' Reply at 3 [Doc. No. 29]), Plaintiff plausibly alleges that Dr. Steinman's comments were made as indirect, offensive references about Plaintiff's gender identity.

Plaintiff also alleges facts that demonstrate Dr. Steinman conducted an "assaultive exam."  (See Pl.'s Mem. at 32 [Doc. No. 25].)  Specifically, Rumble alleges that although he was crying and demanded Dr. Steinman to stop the painful exam, *twice*, Dr. Steinman continued to forcefully jab at Rumble's genitals causing Rumble to continue to cry and scream in pain. (See Compl. ¶¶ 43–45 [Doc. No. 1].)  In fact, it was not until Rumble's mother demanded and yelled for Dr. Steinman to stop jabbing at her son's genitals that Dr. Steinman's allegedly assaultive exam ended.  (Id. ¶ 46.)  At the conclusion of the physical exam, Dr. Steinman then allegedly left the room without explaining to Rumble and his mother what the next steps entailed, such as whether or not Rumble would be admitted to the hospital.  (Id. ¶ 47.)  Plaintiff's allegations about the exam are not "subjective impressions of Dr. Steinman's manner."  (Cf. Def. Emergency Physicians' Mem. at 11 n.2 [Doc. No. 13].)  Rather, these allegations describe an objective series of

events, in which Dr. Steinman ignored Plaintiff's pleas for Dr. Steinman to stop the exam.

Read as a whole, these facts demonstrate that the alleged mistreatment rises to the level of the denial of benefits of appropriate medical care.  (See Pl.'s Mem. at 24 [Doc. No. 25].)  "Whether gender-oriented conduct rises to the level of actionable 'harassment' . . . 'depends on a constellation of surrounding circumstances, expectations, and relationships.'"  Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 651 (1999) (citing Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 82 (1998)).  Generally, the two parties in a doctor-patient relationship are not on equal footing, as a doctor normally has significantly more experience and expertise in his position of authority.  The specific circumstances surrounding Rumble's interaction with Dr. Steinman also supports the Court's finding.  When any individual permits a doctor to conduct a genital exam, the patient is in a physically vulnerable position, which the doctor controls.  Here, Rumble had a reasonable expectation that his treating doctor at the emergency room would not physically "assault" him, or at the very least would stop an intrusive and painful genital exam when asked to stop.

Defendant Emergency Physicians contends that because Rumble was eventually admitted to the hospital and received subsequent medical care, then Dr. Steinman must not have denied Rumble the benefits of medical care.  (See Def. Emergency Physicians' Reply at 3 [Doc. No. 29].)  The Court disagrees.  Section 1557 does not require the plaintiff to demonstrate that he received no medical care or attention.  (Cf. id.)  Rather, the statute simply requires that the plaintiff demonstrate that he was denied the benefits of

a health program or activity, or discriminated against.  Here, Plaintiff meets this burden.

Defendant erroneously argues that in order for Plaintiff's claim to survive dismissal, the Court must "invent facts not alleged by Plaintiff."  (Cf. id. at 4–5.)  In support of this proposition Defendant cites this Court's order in Pittman v. Jesson, No. 12-cv-1410 (SRN/TNL), 2014 WL 4954286, at *11 (D. Minn. Sept. 30, 2014).  In Pittman, this Court held that the patient-plaintiff's race discrimination claim failed against one of the defendants because the plaintiff did not allege that this defendant treated white and black patients differently.  See id.  In fact, the plaintiff did not allege that this defendant treated him adversely in any way, or treated other black patients unfavorably.  See id.  In contrast, here, Rumble sufficiently alleges detailed examples of Dr. Steinman's discriminatory or unfavorable conduct as evidenced by his allegedly rude remarks, and failure to heed Plaintiff's requests to stop the painful exam.  Cf. Folger v. City of Minneapolis, _ F. Supp. 3d _, No. 13-cv-3489 (SRN/JJK), 2014 WL 4187504, at *6, 10 (D. Minn. Aug. 22, 2014) (dismissing the plaintiffs' Fair Housing Act and Equal Protection Clause discrimination claims because the plaintiffs failed to allege "any factual basis" for the defendant's alleged "animus").

Moreover, the Court notes that Plaintiff need not allege facts demonstrating that Dr. Steinman "treated other patients who presented with similar symptoms and medical conditions differently."  (Cf. Def. Emergency Physicians' Mem. at 11 [Doc. No. 13].)  At this stage in the proceeding, without the benefit of discovery, Plaintiff does not have knowledge of how Dr. Steinman treated other patients in the emergency room with similar conditions.  Thus, it would be unreasonable for the Court to require Plaintiff to

plead comparative evidence in his Complaint.  Accordingly, Plaintiff sufficiently alleges

that Emergency Physicians, through Dr. Steinman, took an "adverse action" against him.

### ii.      Dr. Steinman Discriminated On the Basis of Sex

Defendant Emergency Physicians also argues that Rumble failed to allege facts

showing that Dr. Steinman discriminated against Rumble *on the basis* of Rumble's sex.

(See Def. Emergency Physicians' Mem. at 10 [Doc. No. 13].)  Defendant relies on the

Eighth Circuit's holding in Wolfe v. Fayetteville, Arkansas Sch. Dist., 648 F.3d 860, 865

(8th Cir. 2011) to support its contention that Plaintiff must prove that Dr. Steinman

intended to discriminate against Rumble. (See Def. Emergency Physicians' Mem. at 9

[Doc. No. 13].)  Likely, Defendant relies on Wolfe because Plaintiff alleges

discrimination on the basis of sex, and Wolfe involves the Eighth Circuit's analysis of

Title IX, a civil rights statute that prohibits discrimination on the basis of sex.  See 20

U.S.C. § 1681(a).

According to Wolfe, a Title IX plaintiff is "legally required to show" that the

defendant "intended to discriminate against him 'on the basis of sex,' meaning the

harassment was motivated by either [the plaintiff's] gender or failure to conform with

gender stereotypes."  See 648 F.3d at 867.

Even if Plaintiff was required to prove that Dr. Steinman intended to harass

Rumble because of Rumble's transgender status, or Rumble's failure to conform with

gender stereotypes, Plaintiff plausibly alleges facts demonstrating Dr. Steinman's

requisite intent.  As one district court explained, "[a] record of disparate treatment and

unprofessional behavior directed at a plaintiff may constitute evidence of discriminatory

intent." See Pierce v. President and Fellows of Harvard College, 994 F. Supp. 2d 157, 163 (D. Mass. 2014) (denying summary judgment because a jury could infer discriminatory intent from the defendants' unprofessional behavior and the defendants' inconsistent explanations for the treatment plaintiff received). Here, the alleged manner in which Dr. Steinman treated Plaintiff, at a minimum, constitutes "unprofessional behavior," from which a factfinder could infer discriminatory intent.

The Court finds that (1) the alleged questions that Dr. Steinman asked and the comments he made about Rumble's hormone use, (2) Dr. Steinman's alleged tone during questioning, (3) the alleged "assaultive behavior" Dr. Steinman subjected Rumble to during the physical exam, and (4) the medical bill Rumble received after his hospital visit, sufficiently "nudge[]" Rumble's Section 1557 claim "across the line from conceivable to plausible," and plausibly demonstrate Dr. Steinman's discriminatory intent. See Twombly, 550 U.S. at 547.

As the Court noted above, Plaintiff alleges that Emergency Physicians sent Rumble a medical bill after his visit to the hospital that stated, "THE DIAGNOSIS IS INCONSISTENT WITH THE PATIENT'S GENDER." (Id. ¶ 63.) Plaintiff argues that this "insulting bill" further demonstrates how Dr. Steinman's alleged maltreatment of Rumble was based on Rumble's gender. (See Pl.'s Mem. at 12 [Doc. No. 25].) Emergency Physicians contends that this bill was likely sent to Plaintiff as a result of confusion on the part of Rumble's insurer. (See Def. Emergency Physicians' Mem. at 12 [Doc. No. 13].) Defendant additionally notes that "[a]ny temporary confusion reflected in Plaintiff's allegation about [Emergency Physicians'] bill is not a material adverse

action upon which Plaintiff can base a valid claim of sex discrimination." (See id.) The Court agrees, but the Court does not read Plaintiff's Complaint as alleging that the bill forms a separate and distinct factual basis for Rumble's discrimination claim. Rather, the Court reads Rumble's Complaint as alleging that the bill merely bolsters Plaintiff's claim that he was treated adversely because of his gender identity.[10]

Reading the facts alleged in the Complaint as a whole, the Court holds that it is plausible that Dr. Steinman mistreated Plaintiff *because* of Rumble's gender identity, and the mistreatment was not "random[] poor treatment that anyone might have received." (See Pl.'s Mem. at 44 [Doc. No. 25].)

However, the Court notes that it need not determine whether the Wolfe intent standard applies to Plaintiff's Section 1557 claim at this stage in the litigation. As the Court explained in more detail above, Section 1557 references Title VI, Title IX, the Age Discrimination Act, and section 504 of the Rehabilitation Act when listing the grounds for which discrimination is prohibited (e.g., race, color, national origin, sex, age, and disability). See 42 U.S.C. § 18116. Therefore, Defendant Emergency Physicians' insistence that Wolfe's Title IX standard applies because Plaintiff's claim is "on the basis of sex" is not necessarily correct. Likely, Congress intended for the same discriminatory intent standard, and overall burden of proof, to apply to a Section 1557 plaintiff's claim,

---

[10]   The Court notes that neither party clearly describes the billing process, nor explains whether, nor how, Emergency Physicians selects the language to include on the bill. Nonetheless, at this stage in the proceedings the Court finds that the facts alleged about the medical bill are sufficient to bolster Plaintiff's discrimination claims, and push Plaintiff's claims "across the line from conceivable to plausible." See Twombly, 550 U.S. at 547.

regardless of the basis for the alleged discrimination.[11]   Accordingly, the Court declines

to rule on the intent standard required for a Section 1557 claim at this time, but holds that

even if Plaintiff is required to show that Dr. Steinman, or Defendant Emergency

Physicians, intended to discriminate against Plaintiff because of his transgender status,

then Plaintiff has sufficiently alleged plausible facts satisfying this standard.

### 2. Count II: MHRA Claim

"The MHRA requires the plaintiff to show: (1) membership in a protected class;

(2) denial of services or accommodations; and (3) that the denial occurred because of the

plaintiff's membership in the protected class."  Childs v. Extended Stay of Am. Hotels,

No. 10-cv-3781 (SRN/JJK), 2012 WL 2126845, at *5 (D. Minn. June 12, 2012) (citing

Monson v. Rochester Athletic Club v. Rochester Athletic Club, 759 N.W.2d 60, 63

(Minn. Ct. App. 2009)); see Minn. Stat. § 363A.11, subd. 1(a)(1).  Emergency Physicians

argues that Rumble failed to show the second and third elements required to state an

actionable MHRA claim.

Specifically, Emergency Physicians contends that the Court should dismiss

Plaintiff's Count II because (a) Plaintiff "does not assert facts to demonstrate that

[Emergency Physicians] denied Plaintiff any service, facility, privilege, advantage, or

---

[11]     Different intent standards apply to Title IX and the Rehabilitation Act, for
example.  Although Title IX requires that the defendant intended to discriminate, a
Rehabilitation Act plaintiff need only demonstrate that the defendant "fail[ed] to abide by
a legally imposed duty," and need not prove what motivated the defendant's action.  See
Peebles v. Potter, 354 F.3d 761, 767 (8th Cir. 2004) (explaining that "it is not the
employer's discriminatory intent in taking adverse employment action against a disabled
individual that matters.  Rather, discrimination occurs when the employer fails to abide
by a legally imposed duty.").

accommodation of any public accommodation," and (b) Plaintiff does "not asserts facts to show that [Emergency Physicians] discriminated against Plaintiff because of Plaintiff's sexual orientation and gender identity." (See Def. Emergency Physicians' Mem. at 13–14 [Doc. No. 13].) The Court addresses both of these arguments below.

### a. Denied Service or Accommodation

Defendant asserts that Plaintiff failed to allege that he was denied access to any place of public accommodation. (See Def. Emergency Physicians' Mem. at 14 [Doc. No. 13].) Emergency Physicians notes that because Dr. Steinman evaluated Plaintiff in the emergency room, Plaintiff was ultimately admitted to the hospital, and Plaintiff remained hospitalized for seven days, it is clear that Rumble was not "prevented from receiving medical care or otherwise from accessing a public hospital or other facility." (See id.) The Court disagrees.

The MHRA prohibits the "full and equal enjoyment" of a public accommodation. See Minn. Stat. § 363A.11, subd. 1(a)(1). According to the Minnesota Supreme Court, an actionable MHRA claim must include "some tangible change in . . . conditions," or some "material . . . disadvantage." See Bahr v. Capella Univ., 788 N.W.2d 76, 83 (Minn. 2010) (citing Burchett v. Target Corp., 340 F.3d 510, 518 (8th Cir. 2003); Brannum v. Mo. Dep't of Corr., 518 F.3d 542, 549 (8th Cir. 2008); and Jones v. Fitzgerald, 285 F.3d 705, 714 (8th Cir. 2002)).

Reading the facts that Rumble alleges as true, Plaintiff was denied the "full and equal enjoyment of humane and dignified care that other patients would have received." (See Pl.'s Mem. at 38 [Doc. No. 25].) Dr. Steinman allegedly treated Plaintiff

38

inhumanely, not only by allegedly asking Rumble hostile questions meant to embarrass Plaintiff, but also by allegedly continuing with a painful physical examination of Plaintiff's genitals, even after Plaintiff twice cried out for Dr. Steinman to stop the examination.  (See Compl. ¶¶ 39–47 [Doc. No. 1].)  If true, this type of "assaultive exam" demonstrates that Plaintiff likely experienced a material disadvantage compared to others who were seen by emergency room doctors at Fairview.[12]  Therefore, Plaintiff plausibly states a claim that, pursuant to the MHRA, he was denied the full and equal enjoyment of an individual seeking professional and humane medical care from an emergency room physician.

### b.  Dr. Steinman Discriminated *Because of* Rumble's Gender Identity/Sexual Orientation

Defendant Emergency Physicians also contends that Rumble failed to allege that Dr. Steinman's denied him full and equal benefits of emergency room care *because of* Rumble's sexual orientation and gender identity.  (See Def. Emergency Physicians' Mem. at 14 [Doc. No. 13].)  Again, the Court disagrees.

As noted above, the MHRA prohibits discrimination "because of . . . sexual orientation."  See Minn. Stat. § 363A.11, subd. 1(a)(1).  Minnesota law further defines "sexual orientation" as "having or being perceived as having a self-image or identity not

---

[12]      Emergency Physicians claims that Plaintiff's allegations "do not rise to the level of the material adverse events necessary to establish a valid claim of discrimination under the MHRA" because Plaintiff only alleges that (1) he perceived Dr. Steinman to be angry, and (2) he received an erroneous bill for services.  (See Def. Emergency Physicians' Mem. at 15 [Doc. No. 13].)  The Court disagrees.  Plaintiff painstakingly accounts how Dr. Steinman allegedly "jabbed" at Rumble's genitals and did not stop jabbing until Rumble's mother demanded Dr. Steinman to stop.  (See Compl. ¶¶ 43–47 [Doc. No. 1].)

traditionally associated with one's biological maleness or femaleness." See Minn. Stat. §

363A.03, subd. 44.  Thus, solely for the purposes of Plaintiff's MHRA claim, Rumble

alleges that he was discriminated against by Dr. Steinman because of Rumble's "sexual

orientation."

As with Plaintiff's Section 1557 claim against Emergency Physicians, the facts

alleged in Plaintiff's Complaint plausibly demonstrate that Dr. Steinman discriminated

against Plaintiff because of his gender identity or transgender status.  Dr. Steinman's

comments and hostile questioning about Plaintiff's sexual activities, coupled with his

disregard for Rumble's repeated request for Dr. Steinman to stop the painful physical

examination demonstrate that the alleged mistreatment Plaintiff endured was because of

Rumble's gender identity.  (See Pl.'s Mem. at 44 [Doc. No. 25].)

As noted earlier, Rumble need not allege in his Complaint that Dr. Steinman

"treated other patients with similar clinical presentations more favorably because of their

sexual orientation and gender identity."  (Cf. Def. Emergency Physicians' Mem. at 14–15

[Doc. No. 13].)  Rather, Plaintiff need only allege facts that make it plausible that he was

treated differently because of his gender identity.  Rumble correctly states in his brief that

"comparator evidence is only one of several ways that a plaintiff may prove a claim of

discrimination at trial."  (See Pl.'s Mem. at 45 [Doc. No. 25].)  For instance, Plaintiff

may attempt to prove sexual orientation discrimination through "direct evidence in the

form of actions or remarks by [Defendant] that reflect discriminatory intent."  See

Rodgers v. U.S. Bank, N.A., 417 F.3d 845, 859 n.9 (8th Cir. 2005) (Colloton, J.,

concurring) abrogated on other grounds by Torgerson v. City of Rochester, 643 F.3d

1031 (8th Cir. 2011).  Accordingly, Rumble sufficiently alleges "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [his MHRA claim]." Twombly, 550 U.S. at 556.

Emergency Physicians contends that Plaintiff impermissibly "relies on reports and surveys about general adverse treatment of the transgender population" to substantiate his discrimination claim against Dr. Steinman.  (See Def. Emergency Physicians' Reply at 8 [Doc. No. 29].)  The Court disagrees.  Plaintiff does in fact cite to two reports in his Complaint that document discrimination that transgender people experience in health care settings.  (See Compl. ¶¶ 18–23 (citing Lambda Legal, When Health Care Isn't Caring, (2009), http://www.lambdalegal.org/sites/default/files/publications/downloads/whcic-report_when-health-care-isnt-caring.pdf; and Jaime M. Grant et al., Injustice at Every Turn: A Report of the National Transgender Discrimination Survey (2011), http://transequality.org/sites/default/files/docs/resources/NTDS_Report.pdf) [Doc. No. 1].)  While the Court does not read the reference to these reports as the substantive basis or proof of Dr. Steinman's alleged discrimination in this case, these public documents do bolster the plausibility of Plaintiff's claims.

### C.  Defendant Fairview's Motion to Dismiss

Defendant Fairview also filed a Motion to Dismiss Plaintiff's two counts.  (See Def. Fairview's Mot. to Dismiss [Doc. No. 11].)  Plaintiff alleges that "Defendant Fairview is vicariously and/or contractually liable for the actions of its principals, agents, employees, shareholders and/or partners."  (Compl. ¶ 8 [Doc. No. 1].)  Fairview claims that: (1) Fairview cannot be held vicariously liable under either federal or state law for

41

the alleged acts of Dr. Steinman; and (2) Rumble failed to state a viable discrimination claim because he did not allege that any material adverse actions were taken against him. (See Def. Fairview's Mem. at 1 [Doc. No. 20].)  The Court addresses both of these issues below.

### 1.  Liability for Dr. Steinman's Actions

Defendant Fairview claims that "only the facts alleged against *Fairview* are relevant to the instant [m]otion because Fairview is not vicariously liable for the acts Rumble alleges were done by Emergency Physicians [via Dr. Steinman]."  (See Def. Fairview's Mem. at 7 (emphasis original) [Doc. No. 20].)  Fairview suggests that the Court should not consider Dr. Steinman's actions when determining the plausibility of either Plaintiff's Section 1557 claim or his MHRA claim.  The Court holds that it need not determine the vicarious liability standard to apply to Plaintiff's Section 1557 claim because Plaintiff sufficiently alleges that Defendant Fairview is directly liable for Dr. Steinman's actions.  The Court additionally finds that, under the MHRA, Fairview may likely be held indirectly liable for Dr. Steinman's actions.  (See Compl. ¶ 8 [Doc. No. 1].)

### a.  Liability Pursuant to Section 1557 Claim

As it applies to Plaintiff's Section 1557 claim, Fairview contends that it is not vicariously liable for Dr. Steinman's acts because Title IX "does not recognize the concept of vicarious liability," Plaintiff's Section 1557 sex discrimination claim is based on Title IX principles, and therefore, Plaintiff's Section 1557 claim also cannot rely on the concept of vicarious liability.  (See id.)  In opposition, Plaintiff argues that Defendant misstates the relevant Title IX standard, and "even if the Court assumes, as Fairview

42

does, that the Title IX standard controls," then Plaintiff satisfies this standard.  (See Pl.'s Mem. at 21–22 [Doc. No. 25].)  The Court agrees that Fairview does not cite the relevant Title IX standard that may potentially apply to this case.  Moreover, the Court holds that it need not determine the appropriate vicarious liability standard to apply to Plaintiff's Section 1557 claim because Plaintiff sufficiently alleges that Defendant Fairview is directly liable for Dr. Steinman's actions.

The Supreme Court announced the standard for determining a school district's direct liability for an employee's discriminatory acts under Title IX in Gebser v. Lago Vista Independent School District, 524 U.S. 274, 285–91 (1998).  Fairview asserts that the Gebser Court held that "a plaintiff may not use Title IX to hold a [school] district liable for an employee's harassment of a student based on the principles of *respondeat superior* or vicarious liability."  (See Def. Fairview's Mem. at 8 [Doc. No. 20].) Fairview mischaracterizes and misapplies the relevant holding of Gebser.  Rather, in Gebser, the Supreme Court held that a plaintiff *may* use Title IX to hold a district liable for an employee's harassment of a student based on principles of *direct* liability, if an "appropriate person," or "an official who at a minimum has authority to address the alleged discrimination and to institute correctives measures on the recipient's behalf[,] has actual knowledge of discrimination in the recipient's programs[,] and fails adequately to respond."  Gebser, 524 U.S. at 290.  The official's response must "amount to deliberate indifference to discrimination," in order for direct liability to attach.  See id.

Here, Dr. Steinman is not an employee of Fairview.  Rather, as Plaintiff alleges, Dr. Steinman is an employee of Emergency Physicians.  (See Compl. ¶ 12 [Doc. No. 1].)

Therefore, Gebser's direct liability standard for employees is not relevant to this case. Instead, even assuming that the Court should apply case law interpreting Title IX, the Court must analyze the relevant direct liability standard for a third party's actions, as opposed to the actions of an employee.

In Davis, the Supreme Court discussed the standard for determining a school district's direct liability for a third party's discriminatory actions. See 526 U.S. at 633. The Davis Court held that "a [Title IX] private damages action may lie against the school board in cases of student-on-student harassment . . . only where the funding recipient acts with deliberate indifference to known acts of harassment in its programs or activities . . . [and] only for harassment that is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." See id. The Court also held that a school district would only be liable for a third-party's actions when the school "exercises substantial control over both the harasser and the context in which the known harassment occurs." Id. at 630.

The Court finds that even if the Davis Court's Title IX standard applies to this case, Defendant Fairview may be held liable for Dr. Steinman's actions if Plaintiff sufficiently alleges the following four elements: (1) Dr. Steinman's actions effectively barred Rumble's access to reasonable, non-harassing medical care; (2) an appropriate person at Fairview knew of Dr. Steinman's discriminatory acts; (3) that Fairview official acted with deliberate indifference to the discrimination; and (4) Fairview has substantial control over Dr. Steinman and the emergency room. See id. at 630, 633.

At this stage in the litigation, the Court finds that Plaintiff plausibly alleges the

four elements outlined above. First, as discussed in more detail in Part III(B)(1)(b), Dr.
Steinman's alleged treatment of Rumble was "objectively offensive," particularly when
Dr. Steinman refused to stop a painful genital exam, despite Plaintiff's repeated pleas.
By allegedly ignoring Plaintiff's requests, Dr. Steinman effectively barred Plaintiff from
an opportunity to have "humane and dignified [medical] care." (See Pl.'s Mem. at 34
[Doc. No. 25].) A reasonable person, seeking treatment from an emergency room doctor
at a hospital, would expect that the doctor would respect the patient's wishes to stop a
painful exam.

Plaintiff also sufficiently alleges that an "appropriate person" knew of Dr.
Steinman's behavior and actions. Specifically, Rumble alleges that Dr. Lehrman, an
OB/GYN employed by Fairview, and a female nursing assistant/emergency room
technician, also presumably employed by Fairview, were in the exam room, saw Dr.
Steinman complete the exam, and did not intervene or stop Dr. Steinman from
proceeding with the exam. (See Compl. ¶ 48 [Doc. No. 1].) The Eighth Circuit has
noted that it cannot "pretend to fashion a bright-line rule as to what job titles and
positions automatically mark an individual as having sufficient authority or control for
the purposes of Title IX liability." See Plamp v. Mitchell Sch. Dist. No. 17-2, 565 F.3d
450, 457 (8th Cir. 2009) (citing Murrell v. Sch. Dist. No. 1, Denver, Colo., 186 F.3d
1238, 1247 (10th Cir. 1999) (explaining that "[b]ecause officials' roles vary among
school districts, deciding who exercises substantial control for the purposes of Title IX
liability is necessarily a fact-based inquiry.")).

Here, although Plaintiff does not detail whether either Dr. Lehrman or the female

nursing assistant have "authority to address the alleged discrimination and to institute correctives measures," Gebser, 524 U.S. at 290, the Court does not expect that Plaintiff would be able to do so without further discovery, see Plamp, 565 F.3d at 457.  Therefore, for the purposes of Defendants' Motions to Dismiss, the Court finds that Plaintiff plausibly alleges that at least one "appropriate person" knew of Dr. Steinman's "assaultive" exam.

The Court also concludes that Plaintiff plausibly alleges that either Dr. Lehrman or the nursing assistant acted with deliberate indifference to Dr. Steinman's discriminatory behavior by not intervening or stopping Dr. Steinman from continuing with the genital exam.  Finally, the Court finds that Rumble plausibly alleges that Fairview has substantial control over the Fairview emergency room and over Dr. Steinman, a doctor who works in Fairview's emergency room.  (See Compl. ¶ 7 [Doc. No. 1].)  Additional facts about the control Fairview exercises will only become evident after discovery.

Therefore, even assuming that the Title IX standard for direct liability for a third-party's actions applies to this case, Plaintiff satisfies his burden.  Accordingly, the Court considers Dr. Steinman's alleged actions when evaluating the plausibility of Plaintiff's Section 1557 claim against Defendant Fairview.  The Court emphasizes, however, that it is not entirely clear whether Plaintiff must satisfy the four elements outlined above. Because Section 1557 incorporates and references four civil rights statutes, only one of which is Title IX, the Court may conclude that Plaintiff is not required to satisfy the Title IX liability standard.  Rather, Plaintiff may be subject to an entirely different burden of proof under the unique cause of action created by Section 1557.

46

### b.  Liability Pursuant to the MHRA

In addition to arguing that Fairview is not liable for Dr. Steinman's actions for

Plaintiff's Section 1557 claim, Defendant also claims that Fairview is not vicariously

liable for Dr. Steinman's actions for Plaintiff's MHRA claim.  (See Def. Fairview's

Mem. at 8 [Doc. No. 20].)  Similar to the Court's finding with respect to Plaintiff's

Section 1557 claim, the Court holds that Plaintiff plausibly alleges that Fairview is liable

for Dr. Steinman's actions for the MHRA claim as well.

The Court's analysis is guided by Title VII case law because Title VII and the

MHRA are often interpreted similarly.  See Torgerson v. City of Rochester, 643 F.3d

1031, 1043 (8th Cir. 2011) (finding that "the same analysis applies to both MHRA and

Title VII claims"); see also Kasper v. Federated Mut. Ins. Co., 425 F.3d 496, 502 (8th

Cir. 2005); Bahr v. Capella Univ., 788 N.W.2d 76, 83 (Minn. 2010).[13]  As this Court has

done previously, it assumes, without deciding, "that standards for employer liability in

federal hostile environment case law apply to [Rumble's] public-services [discrimination]

claim under the MHRA."  See Hudson, 2006 WL 752935, at *11.

Title VII and the MHRA first require a plaintiff to show that the defendant was the

third party's de facto employer.  A plaintiff may demonstrate this de facto employee-

---

[13]     The Court notes that although the statutes are often interpreted similarly, it is
unclear whether a distinction exists under the MHRA between the standard for vicarious
liability for sexual harassment in an employment setting and the standard for vicarious
liability in the public accommodation setting.  See Hudson v. City of Minneapolis, No.
04-cv-3313 (JNE/FLN), 2006 WL 752935, at *11 (D. Minn. Mar. 23, 2006).
Nonetheless, as other courts have done, see id., the Court proceeds by applying the
standard that courts have used for vicarious liability for sexual harassment in an
employment setting, under the MHRA.

47

employer relationship either by liberally interpreting the term "employer," see <u>Baker v. Stuart Broad. Co.</u>, 560 F.2d 389, 391 (8th Cir. 1977) (citing <u>Sibley</u> <u>Memorial Hospital v. Wilson</u>, 488 F.2d 1338 (D.C. Cir. 1973)), or by showing how the relationship between the defendant and the third party satisfies a twelve factor test as set out in <u>Schweiger v. Farm Bureau Ins. Co. of Neb.</u>, 207 F.3d 480, 484 (8th Cir. 2000)[14].  See also <u>Stoner v. Ark. Dep't of Corr.</u>, 983 F. Supp. 2d 1074, 1087–88 (E.D. Ark. 2013) (finding that the defendant was the third party's de facto employer under Title VII, either under the twelve factor test or under a liberal construction of the term "employer," because the facts showed that the defendant's policies applied to the third party, and the defendant controlled whether the third party was banned from the defendant's complex, which would "effectively terminat[e] [the third party's] employment").

Similarly, Title VII and the MHRA also require a plaintiff to show that the defendant controlled the plaintiff's environment and could alter the conditions of the

---

[14]    The Eighth Circuit explained in <u>Schwieger</u> that in order to determine whether an employer-employee relationship exists "[a] primary consideration is the hiring party's right to control the manner and means by which a task is accomplished."  <u>Schwieger</u>, 207 F.3d at 484.   The Eighth Circuit also noted the following twelve factors that a court could take into account when determining whether an employer-employee relationship exists:

> the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

<u>Id.</u> (quoting <u>Nationwide Mut. Ins. Co. v. Darden</u>, 503 U.S. 318, 323–24 (1992)).

environment, knew or should have known of the discrimination, and failed to take prompt remedial action. See Crist v. Focus Homes, Inc., 122 F.3d 1107, 1111–12 (8th Cir. 1997) (holding that defendant residential program operator could be held liable for sexual harassment under the MHRA and Title VII for the acts of its employees because the defendant "clearly controlled" the plaintiff's environment and "had the ability to alter those conditions to a substantial degree").

Here, Plaintiff alleges that Fairview was Dr. Steinman's "employer," liberally construed, because Fairview exercised control over the physicians who work in the emergency room. (See Pl.'s Mem. at 23 [Doc. No. 25].) Rumble further alleges that Fairview could have stopped or prevented Dr. Steinman from discriminating against Plaintiff; Fairview knew of the discrimination because Dr. Lehrman and the nursing assistant witnessed it; and Fairview failed to take prompt remedial action. (See Compl. ¶¶ 48, 81 [Doc. No. 1].) Defendant contends, in contrast, that it had no opportunity to control or prevent Dr. Steinman's actions. (See Def. Fairview's Mem. at 9 [Doc. No. 20].) As the Court noted above with respect to Plaintiff's Section 1557 claim, the Court cannot conclude without discovery whether Fairview, in fact, had the opportunity to control Dr. Steinman. Nonetheless, at this stage in the litigation, the Court construes all reasonable inferences in the light most favorable to Plaintiff, Morton v. Becker, 793 F.2d 185, 187 (8th Cir. 1986), and concludes that Fairview plausibly may have been able to control Dr. Steinman; and thus, may be held indirectly liable for Dr. Steinman's actions. Accordingly, the Court considers Dr. Steinman's alleged actions when evaluating the plausibility of Plaintiff's MHRA claim against Defendant Fairview.

## 2.  Plausibility of Section 1557 Claim

Fairview contends that Rumble failed to state a claim under Section 1557.  (See Def. Fairview's Mem. at 9 [Doc. No. 20].)  Specifically, Fairview argues that although the "alleged differential treatment must be *material* to be actionable," here, Rumble failed to allege facts that constitute plausible, actionable discrimination.  (See Def. Fairview's Mem. at 12 (emphasis original) [Doc. No. 20].)  Defendant claims that "Rumble's allegations of snubs and delays are only the proverbial 'perceived slights' that the Eighth Circuit has held are *not* sufficient to give rise to a discrimination claim."  (See id. at 12–13 (emphasis original).)

Because Fairview contends that it is not liable for Dr. Steinman's actions, Fairview does not discuss how Dr. Steinman's treatment of Plaintiff affects the plausibility of Plaintiff's Section 1557 claim.  Thus, Fairview focuses solely on the alleged actions of hospital staff and asserts that the following treatment was not discriminatory: (1) Plaintiff received a hospital bracelet identifying his sex as "female;" (2) Rumble waited for several hours before he received treatment in the emergency room; (3) the "OB/GYN" notation was written on the dry erase board in Rumble's hospital room; (4) Fairview nurses examined Rumble's genitals while he was a patient at the hospital; (5) a Fairview nurse told Rumble that she does not know what was wrong with Rumble "because [she didn't] have any experience with this sort of thing;" and (6) hospital staff whispered about Plaintiff, and hospital nurses behaved unfriendly toward Rumble.  (See Def. Fairview's Mem. at 13 [Doc. No. 20].)

Defendant correctly states that "mere name-calling" is not enough to arise to the

level of an actionable discrimination claim.  See Scusa v. Nestle U.S.A. Co., 181 F.3d

958, 969–70 (8th Cir. 1999) (holding that "general allegations of co-worker ostracism are

not sufficient to rise to the level of an adverse employment action for purposes of Title

VII."); Oncale, 523 U.S. at 80–81 (explaining that Title VII does not prohibit all verbal or

physical harassment, rather, a plaintiff must prove that the conduct at issue constituted

discrimination because of sex and was not just "merely tinged with offensive sexual

connotations"); Davis, 526 U.S. at 651–52 (holding that for a plaintiff to have an

actionable Title IX claim the harassment must amount to more than "simple acts of

teasing and name-calling among school children"); see also Wolfe, 648 F.3d at 866–67

(holding that the plaintiff must prove that the harassment complained of amounted to

more than mere name-calling, in order to state an actionable Title IX claim); Shaver v.

Indep. Stave Co., 350 F.3d 716, 721 (8th Cir. 2003) (finding that "[c]onduct that is

merely rude, abrasive, unkind, or insensitive does not come within the scope of the

[Americans with Disabilities Act]").[15]

However, the Court disagrees with Fairview insofar as it contends that the hospital

staff's alleged conduct amounts to only "perceived slights."  (See Def. Fairview's Mem.

at 12 [Doc. No. 20].)  Much of the conduct that Plaintiff alleges amounted to more than

---

[15]    The Court notes that while Defendant ardently argues that only Title IX case law
applies for determining whether Fairview is liable for Dr. Steinman's actions, Fairview
references case law analyzing Title VII and the Americans with Disabilities Act when
discussing whether Fairview's conduct amounts to an actionable Section 1557 claim.
(See Def. Fairview's Mem. at 12–13 [Doc. No. 12].)  The fact that even Defendant
Fairview is inconsistent about which standards to apply, bolsters the Court's
understanding that Section 1557 is likely not bounded by the existing interpretation of
only one civil rights statute.  Rather, Section 1557 creates a new cause of action that may
require courts or the OCR to determine new standards.

"mere name-calling," and constituted objectively offensive behavior.

For instance, Plaintiff contends that Fairview purposefully "misgender[ed]" Plaintiff, by giving Rumble a hospital bracelet that identified his sex as "female." (See Pl.'s Mem. at 33–34 [Doc. No. 25].) Plaintiff explains that the "deliberate misgendering" of transgender people is a prime example of "trans-exclusion." (See id. (citing Julia Serano, Whipping Girl: A Transsexual Woman on Sexism and the Scapegoating of Femininity (2007).) Plaintiff alleges that the intake clerk purposefully and deliberately gave him a hospital bracelet that incorrectly identified his gender even after he explained that he had transitioned to identifying as male. (See Compl. ¶ 29 [Doc. No. 1].) Given Plaintiff's transgender status and the fact that the clerk was aware of Plaintiff's preferred gender, Fairview's misgendering of Rumble could be considered objectively offensive behavior.

The fact that Rumble was forced to wait for several hours in the emergency room before being provided pain medication or being seen by an emergency room doctor also amounts to more than a "perceived slight." (See id. ¶¶ 35–37.) Rumble's health and well-being was at stake while he waited in severe pain for someone at Fairview to treat him. (See id. ¶ 35–36.) Fairview's alleged delay in treating Plaintiff is even more appalling given Plaintiff's allegation that "people with less urgent medical needs were treated much more quickly than [Rumble] was treated." (Id. ¶ 37.) The urgent severity of Plaintiff's condition when he entered Fairview is evident by the fact that a Fairview doctor allegedly told Rumble's mother that her son "would have been septic within 12 to 24 hours" from being brought to the hospital. (Id. ¶ 59.)

Moreover, in addition to the fact that Plaintiff had to wait for Dr. Steinman, Plaintiff then also waited for several more hours before being admitted to the hospital and treated with any sort of antibiotic. (Id. ¶¶ 49–50.) As Plaintiff explains, "several times during his time at Fairview, Rumble was refused care, and at other times, he was refused humane and dignified care." (See Pl.'s Mem. at 34 [Doc. No. 25].) Forcing Plaintiff to wait hours on end, while he was in unbearable pain and could have entered septic shock, is clearly actionable discriminatory conduct, if Fairview staff were motivated by the fact that Plaintiff is transgender.

Additionally, the fact that Dr. Obaid conducted a genital exam of Plaintiff's inflamed genitals, wiped his gloves on Plaintiff's hospital bed, and then examined Plaintiff's eyes and mouth using the same gloves also amounts to more than a "perceived slight." (See Compl. ¶ 56 [Doc. No. 1].) If this alleged conduct was because of Plaintiff's transgender status, then this incident also serves as a basis for Plaintiff's Section 1557 claim. This behavior amounts to conduct that is more than simply insensitive. Rather, if true, it constitutes unacceptable medical care, in which a medical professional misused his authority to harass a patient. (See Pl.'s Mem. at 38 [Doc. No. 25].) As the Supreme Court noted in Davis, "[t]he relationship between the harasser and the victim necessarily affects the extent to which the misconduct can be said to breach Title IX's guarantee of equal access to educational benefits." Davis, 526 U.S. at 653. Here, the Court finds that the relationship between the harasser and the victim necessarily affects the extent to which the misconduct breaches Section 1557's guarantee of equal access to medical benefits and care. Just as "teacher-student harassment" is more likely

to satisfy the requirements for a Title IX claim than "peer harassment," so too is medical professional-patient harassment more likely to satisfy the requirements for a Section 1557 claim than patient-patient harassment.

Finally, Plaintiff also alleges that it was objectively offensive that: a hospital staff person had written the "OB/GYN" notation on the dry erase board in his hospital room; and that hospital staff whispered about him; and that hospital nurses behaved unfriendly toward him.  (See Compl. ¶¶ 31, 55, 57 [Doc. No. 1].)  Although, on its own, this behavior may be insufficient to constitute discrimination under Section 1557, the Court reads these allegations in tandem with the other allegations in Plaintiff's Complaint and concludes that, as a whole, Plaintiff states a plausible Section 1557 claim against Fairview.  See Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 594 (8th Cir. 2009) (holding that a court must read a complaint as a whole "to determine whether each allegation, in isolation, is plausible").

Consistent with the Court's findings above, it is plausible that Fairview staff treated Plaintiff in the manner that they did because of his protected class status.  The emergency room clerk was plausibly aware of Plaintiff's transgender status as a result of the conversation he had with Rumble about the difference between Rumble's assigned gender at birth and his current gender.  The hospital staff members who made Plaintiff wait before and after seeing Dr. Steinman were also plausibly aware that Rumble is transgender because they could have found out this information from the intake clerk or Dr. Steinman.  Additionally, the nurses and physicians who treated Plaintiff during his several day stay at the hospital were also plausibly aware that Plaintiff was transgender

because they knew from examining Rumble that Rumble identifies as male, but has female genitalia.  Moreover, the Court notes that if Defendant Fairview is later determined to be liable for Dr. Steinman's actions, then additional facts pertaining to the genital exam Dr. Steinman completed further bolster the plausibility that Fairview violated Section 1557.

### 3.  Plausibility of MHRA Claim

Defendant Fairview argues that Rumble failed to state a plausible MHRA claim because Rumble did not allege that: (1) Fairview took any "tangible" or "material" adverse action against him that resulted in a denial of services (see Def. Fairview's Mem. at 14 [Doc. No. 20]); and (2) the actions that Fairview did take were driven by "discriminatory animus" (see Def. Fairview's Reply at 9 [Doc. No. 28]).[16]  The Court addresses both of these arguments below.

### a.  Adverse Action

Defendant claims that Plaintiff merely alleges facts substantiating "hurt feelings," and not a denial of services or accommodations or discrimination to substantiate his MHRA claim.  (See Def. Fairview's Mem. at 14–15 [Doc. No. 20].)  The Court disagrees.  Although generally an MHRA claimant alleges an outright "denial" of services or accommodations, Childs, 2012 WL 2126845, at *5, a plaintiff may also allege

---

[16]     Fairview also argues that the Court should dismiss Plaintiff's MHRA claim because the Court may decline to exercise supplemental jurisdiction over the state-law claim if the "court has dismissed all claims over which it has original jurisdiction."  (See Def. Fairview's Mem. at 14 n.11 (citing 28 U.S.C. § 1367(c)(3)) [Doc. No. 20].)  As the Court did not dismiss Plaintiff's Section 1557 claim against either Defendant, the Court finds that Fairview's argument is inapposite.

a denial of the "full and equal enjoyment" of services, see Minn. Stat. § 363A.11.  In

other words, a plaintiff may allege that he received materially inferior services because of

his protected class status.  See id.; Bahr v. Capella Univ., 788 N.W.2d 76, 83 (Minn.

2010) (citing Burchett, 340 F.3d at 518; Brannum, 518 F.3d at 549; and Jones, 285 F.3d

at 714).  Therefore, the MHRA does not require Plaintiff to allege that he was denied

services.  Rather, pursuant to the MHRA, Rumble appropriately alleges that he received

inferior medical services from Fairview.  (See generally Compl. [Doc. No. 1].)

     As the Court discussed in detail above, Plaintiff alleges facts about the harassment

he experienced from the intake clerk, Dr. Obaid, the hospital staff, and the hospital nurses

that, read as a whole, amount to an allegation that he received inferior medical care and

treatment.  See supra Part III(C)(1)(b)(2).  The hospital staff's conduct and behavior

amounts to more than mere "perceived slights" or "hurt feelings."  Additionally, if the

Court ultimately determines that Fairview is liable for Dr. Steinman's actions, then

Plaintiff's MHRA claim against Fairview is further bolstered by facts demonstrating that

Dr. Steinman treated Rumble poorly or adversely.

     Rumble's case is clearly distinguishable from Porter v. Children's Health-Care

Minneapolis, No. C5-98-1342, 1999 WL 71470 (Minn. Ct. App. Feb. 16, 1999).  (See

Def. Fairview's Mem. at 16 [Doc. No. 20].)  In Porter, the Minnesota Court of Appeals

upheld the district court's grant of summary judgment for the defendant on the plaintiff's

MHRA discrimination claim.  See 1999 WL 71470, *6.  The Porter Court held that the

plaintiff's MHRA claim failed because the plaintiff did not provide sufficient direct and

circumstantial evidence that "he was treated differently from anyone else using [the

defendant's] services at that time and under those circumstances."  Id.

In contrast, here, Plaintiff provides the requisite direct and circumstantial evidence.  Based on observing the individuals who came into the emergency room, Rumble alleges that "people with less urgent medical needs were treated much more quickly than [he was]."  (See Compl. ¶ 37 [Doc. No. 1].)  Therefore, Plaintiff alleges that he was treated differently from others seeking Fairview's services at the exact same time that he was seeking medical services from Fairview.  Cf. Porter, 1999 WL 71470, at *6.  Moreover, Plaintiff alleges that a Fairview staff person admitted to his mother that although Rumble was forced to wait for nearly seven hours in the emergency room before being admitted to the hospital or receiving treatment, Fairview did not usually keep patients waiting for this long.  (See Compl. ¶ 50 [Doc. No. 1].)  If the Court accepts this allegation as true, then the facts show that even one of Defendant's employees admitted that Plaintiff received disparate treatment.  Accordingly, Rumble plausibly alleges that Fairview denied him the "full and equal enjoyment" of medical services, and the disparate treatment amounts to an actionable adverse action under Minn. Stat. § 363A.11.

### b.  Discriminatory Animus

Fairview also contends that Plaintiff's allegations do not demonstrate that he was denied medical treatment "because of" his sexual orientation or gender identity.  (See Def. Fairview's Reply at 8–9 [Doc. No. 28].)  Fairview claims that Plaintiff's allegations are based only on his "subjective belief" that he received disparate treatment "because of" his transgender status.  (See id. at 9.)  The Court disagrees.

To prove a claim of disparate treatment under the MHRA, "proof of

discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment."  See Hubbard v. United Press Intern., Inc., 330 N.W.2d 428, 441 n.12 (Minn. 1983) (quoting International Brotherhood of Teamsters v. United States, 431 U.S. 324, 335–36 n.15 (1977)).  Rumble alleges several facts demonstrating that he was treated poorly or differently from other patients at the hospital. See supra Part III(C)(1)(b)(2).  In fact, as the Court noted above, a Fairview staff person even admitted to Plaintiff that Fairview did not usually make people wait in the emergency room for nearly seven hours.  (See Compl. ¶ 50 [Doc. No. 1].)  And as with Plaintiff's Section 1557 claim, the Court also notes that if Defendant Fairview is determined to be liable for Dr. Steinman's actions, then additional facts pertaining to the genital exam Dr. Steinman completed may be used to show how Rumble received disparate treatment from Fairview in violation of the MHRA.  Accordingly, at this stage of the proceedings, the Court finds that a discriminatory motive may be plausibly inferred from the fact that Rumble received disparate treatment.

The Court notes that, generally, merely pleading "on information and belief, without more, is insufficient to survive a motion to dismiss for failure to state a claim." Kampschroer v. Anoka Cnty., No. 13-cv-2512 (SRN/TNL), 2014 WL 5530590, at *14 (D. Minn. Nov. 3, 2014) (citing Solis v. City of Fresno, No. 1:11–cv–00053, 2012 WL 868681, at *8 (E.D. Cal. Mar. 13, 2012)).  And Defendant correctly notes that Plaintiff alleges that he: (1) "*believed*" that the intake clerk was discussing his gender with another person (Compl. ¶ 31 (emphasis added) [Doc. No. 1]); (2) "*believed* that people with less urgent medical needs were treated much more quickly than [he] was treated" (id. ¶ 37)

58

(emphasis added); and (3) "had the *impression* that some of the nurses were hostile towards him" (id. ¶ 57) (emphasis added).

Here, however, Plaintiff's allegations are not based solely upon information and belief.  Rather, Plaintiff's allegations of discriminatory animus are based on the totality of the circumstances surrounding each interaction he had with Fairview employees.

For instance, the Court finds it plausible that the intake clerk was in fact whispering about Plaintiff's gender with another person, based on the fact that Plaintiff alleges that the whispering took place right after the clerk had a conversation with Plaintiff about his gender on file.  (See Compl. ¶¶ 29–31 [Doc. No. 1].)  Therefore, Plaintiff plausibly "believed" the whispering was motivated by discriminatory animus.  (See id. ¶ 31.)  It is also plausible that Rumble and his mother "believed" that other patients with less urgent medical needs were treated more quickly than Rumble was, because Plaintiff and his mother may have seen patients entering and exiting the emergency room waiting room and approaching the intake desk.  (See id. ¶ 37.)  In addition, Rumble may have had the "impression" that some of the nurses were hostile towards him because of his gender identity, based on a reasonable expectation that nurses would usually not avoid speaking to patients when caring for them.  (See id. 57.)  Thus, in sum, Plaintiff's allegations of discriminatory animus are based on more than pure speculation.

Defendant cites the following cases to bolster its claim that Plaintiff failed to plausibly allege that Fairview had discriminatory animus: (1) Bilal v. Northwest Airlines, Inc., 537 N.W.2d 614 (Minn. 1995); (2) Nash v. JBPM, Inc., No. 09-cv-1437

(RHK/RLE), 2010 WL 2346605 (D. Minn. June 9, 2010); (3) Phillips v. Speedway

SuperAmerica LLC, No. 09-cv-2447 (RHK/FLN), 2010 WL 4323069 (D. Minn. Oct. 22,

2010); and (4) Willenbring v. City of Breezy Point, No. 08-cv-4760 (MJD/RLE), 2010

WL 3724361 (D. Minn. Sept. 16, 2010).  However, each of these cases is distinguishable.

First, the Court notes that all of these cases were decided after a full evidentiary trial was

held, or upon a motion for summary judgment, after discovery had taken place.  Here,

Plaintiff has not yet had the benefit of the discovery process and is left with only the

information that was readily available to him while he was a patient at Fairview.  Second,

these cases are clearly distinguishable insofar as the plaintiffs in these cases failed to

substantiate their claims of discriminatory animus with any circumstantial or direct

evidence.

        For instance, in Bilal, the Minnesota Supreme Court held that the trial court

judgment was properly reversed because the plaintiff had "not established a

discriminatory motive on the part of [the defendant] or its employees."  See 537 N.W.2d

at 619.  The plaintiff alleged that one of the defendant's employees had discriminated

against her, because although the plaintiff was Muslim, the employee had told the

plaintiff that she should "dress as if she were going to church."  Id. at 617.  The

Minnesota Supreme Court explained that because the employee "did not even know of

which religion, if any, [the plaintiff] was a member," then the employee could not have

"intentionally discriminated against [the plaintiff]."  Id. at 619.  Here, however, Plaintiff

alleges that the Fairview employees either affirmatively knew or were likely aware that

Rumble is transgender, and thus could have intentionally discriminated against him.

Nash is similarly distinguishable from Rumble's case. In Nash, the pro se plaintiff had not even filed a response brief to the defendant's motion for summary judgment. See 2010 WL 2346605, at *2. Therefore, the court held that there was no basis for a reasonable jury to conclude that the defendant's actions were taken because of the plaintiff's protected class status since the plaintiff had "proffered no evidence at all in response to [the defendant's] Motion." See id. The Nash Court explained that without any evidence to the contrary, it was forced to conclude that the defendant might act similarly to all customers, regardless of the customer's race. See id. Here, Rumble sufficiently alleges facts demonstrating that Fairview's actions were plausibly taken because of Rumble's protected class status. Moreover, Plaintiff alleges that other patients were likely treated differently and better than he was, because they were not transgender. While Rumble cannot yet proffer more specific evidence of comparative treatment at this stage in the litigation, after discovery Plaintiff will have the opportunity to present this evidence.

Phillips is also distinguishable from Rumble's case. In Phillips, the court granted the defendant's motion for summary judgment on the plaintiff's MHRA claim because the plaintiff failed to present evidence that permitted the inference that the conduct complained of was motivated by the plaintiff's race. See 2010 WL 4323069, at *3. The court specifically noted that "[t]here is no dispute that other black customers patronized [the defendant's] store on the night in question, and they were neither detained nor accused of shoplifting," the plaintiff "proffered no evidence indicating that the store ha[d] a history of accusing blacks of theft or that [the defendant's employees] singled out black

61

customers for disparate treatment," and an employee's lone comment about race was "insufficient to establish that [the defendant's employees] acted out of racial animosity." See id. However, as Rumble argues, "the [Phillips Court] does not state or even imply that if the plaintiff had provided sufficient evidence that he was accused of shoplifting and physically grabbed *because of* his race, that those actions would not have constituted discrimination." (See Pl.'s Mem. at 41 (emphasis added) [Doc. No. 25].)

Here, Rumble alleges facts that permit the inference that the conduct of Fairview staff was motivated by Plaintiff's transgender status. Specifically, Plaintiff alleges that based on the totality of the circumstances Fairview staff likely knew, or were affirmatively aware, that Plaintiff was transgender. Thus, Plaintiff plausibly alleges that he received disparate treatment because of his gender identity. The Court does not expect Plaintiff to bolster his MHRA claim with more substantive evidence at this stage in the litigation. Rather, Plaintiff must only allege "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim]." Twombly, 550 U.S. at 556. Accordingly, Plaintiff meets this burden.

Finally, Plaintiff's case is also distinguishable from Willenbring. See 2010 WL 3724361. In Willenbring, the court granted the defendant's motion for summary judgment on the plaintiff's MHRA claim because the plaintiff provided no evidence suggesting that the defendant's employee's conduct was "motivated by [the plaintiff's] status as a woman." Id. at *12. Here, as earlier described in great detail, Plaintiff sufficiently alleges facts demonstrating that Fairview's conduct was motivated by Rumble's transgender status. Since "[a] record of disparate treatment and unprofessional

behavior directed at a plaintiff may constitute evidence of discriminatory intent," <u>Pierce</u>, 994 F. Supp. 2d at 163, Plaintiff's Complaint meets the requisite threshold to survive dismissal.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

1. Defendant Emergency Physicians' Motion to Dismiss [Doc. No. 11] is **DENIED.**

2. Defendant Fairview's Motion to Dismiss [Doc. No. 18] is **DENIED.**


Dated:  March 16, 2015                    s/Susan Richard Nelson
                                          SUSAN RICHARD NELSON
                                          United States District Judge